

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-20-1994

# Penn Medical Society v. Snider

Precedential or Non-Precedential:

Docket 93-7775

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation
"Penn Medical Society v. Snider" (1994). *1994 Decisions.* Paper 87.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/87

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————————————

No. 93-7775

———————————————

PENNSYLVANIA MEDICAL SOCIETY;
DR. JAMES B. REGAN, M.D.,

v.

KAREN F. SNIDER, Individually and in
her Official Capacity as Secretary of Public Welfare;
DONNA E. SHALALA, Secretary of the
United States Department of Health and Human Services

Pennsylvania Medical society;
James B. Regan, M.D.
Appellants

———————————————

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Civ. Action No. 92-cv-00481)

———————————————

Argued: May 26, 1994

Before: COWEN, ROTH, Circuit Judges,
and BROWN, District Judge[0]

(Filed July 20, 1994)

———————————————

Robert B. Hoffman (argued)
Reed, Smith, Shaw & McClay
213 Market Street, 9th Floor
P. O. Box 11844
Harrisburg, PA 17108

    Counsel for Appellants

———

[0]Honorable Garrett E. Brown, Jr., United States District Court
for the District of New Jersey, sitting by designation.

1

Peter D. Coffman
United States Department of Justice
Federal Programs Branch,
Civil Division
9th and Pennsylvania Avenue, N.W.
P.O. Box 883
Washington, D.C.  20530


Richard A. Olderman (argued)
United States Department of Justice
Room 3617
Civil Division
10th and Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

            Counsel for Appellee Donna E. Shalala

Doris M. Leisch
Room 302
Commonwealth of Pennsylvania
Department of Public Welfare
1400 Spring Garden Street
State Office Building
Philadelphia, PA 19130

            Counsel for Appellee Karen F. Snider

---

**OPINION OF THE COURT**

---


COWEN, <u>Circuit</u> <u>Judge</u>.

        Under the Medicaid Act, a state participating in the Medicaid program must pay certain cost-sharing expenses for qualified Medicare beneficiaries (QMBs) in order to make these QMBs eligible for certain Medicare benefits called Medicare Part B services.  The State of Pennsylvania, which participates in the Medicaid program, limits its coinsurance and deductible payments under Medicare Part B so that the total amount of the

2

reimbursements does not exceed the amount that the health care provider would have received for the services pursuant to the Medicaid plan. Pennsylvania Medical Society and Dr. James B. Regan brought this action under 42 U.S.C. § 1983 seeking a declaration that the Pennsylvania Medicaid Plan violated the Medicare Act and the Medicaid Act. The district court denied relief by granting summary judgment for the defendants. This appeal followed.[0] We have jurisdiction under 28 U.S.C. § 1291 and our review is plenary because only purely legal questions are involved. We hold that the Pennsylvania limitation on payment violates both the Medicare Act and the Medicaid Act, and will reverse the judgment of the district court.

## I.

The question presented in this appeal implicates the Medicare Act and the Medicaid Act. Accordingly, we will summarize the relevant statutory provisions involved and sketch the context from which the dispute arose.

## A.

The Medicare Act, 42 U.S.C. §§ 1395–1395ccc, established the Medicare program. Under the Medicare Act, the federal government funds the Medicare program. Eligibility for Medicare benefits is based on old age or disability: an individual must be at least 65 years old or disabled to be

---

[0]The appellants also sought an injunction requiring Pennsylvania to implement 42 U.S.C. § 1395v(f). By letter dated May 10, 1994 the appellants advised the court that Pennsylvania had decided to voluntarily implement § 1395v(f) and thus they would not pursue this issue further.

3

eligible. 42 U.S.C. § 426(a). These individuals are commonly referred to as Medicare-eligible patients.

Medicare coverage is primarily divided into two parts. Part A covers all inpatient hospital expenses through an insurance plan. See 42 U.S.C. §§ 1395c to 1395i-4. All Medicare-eligible patients receive this benefit. This coverage is not in dispute in this case.

Part B covers certain physician services, hospital outpatient services, and other health services not covered under Part A. See 42 U.S.C. §§ 1395j to 1395w-4(j). Part B coverage is not freely or automatically available to all Medicare-eligible patients. To obtain this coverage, Medicare-eligible patients must first enroll in the Part B insurance program by paying insurance premiums ("Part B insurance premiums"). See §§ 1395o-1395s. Once this is done, the federal government pays 80% of the "reasonable costs" of outpatient hospital services and 80% of the "reasonable charges" for physician services rendered to the insured. § 1395l. The Part B patients themselves must pay the remaining 20% of the charges for the reasonable outpatient hospital services and physician services (co-payments or coinsurance), as well as an annual deductible. Id.; §1395cc(a)(2)(A). Together, the Part B premiums, deductibles and coinsurance are generally referred to as "Part B cost-sharing." Reasonable costs and charges for the services covered under Part B are established pursuant to the Medicare Act and its implementing regulations. See § 1395w-4(a), (b).

4

However, the payment of the Part B insurance premiums, the 20% coinsurance, and the deductibles poses a serious problem for some poor Medicare-eligible patients. Therefore, these individuals may have to forego Part B coverage completely. How Congress resolved this problem is at the heart of the dispute in this case.

B.

The Medicaid Act, 42 U.S.C. § 1396 et seq., established the Medicaid program which is separate from the Medicare program. Under the Medicaid Act, the federal government and the states jointly fund the Medicaid program with the federal government contributing approximately between 50% and 83% of the funding, with the states responsible for the rest. § 1396d(b). Eligibility for Medicaid benefits is based on need. A patient becomes eligible if his or her income falls below a certain level. See § 1396d(a).

A state is not required to participate in the Medicaid program, but if it decides to participate, it must comply with the Medicaid Act and its implementing regulations. § 1396c. A participating state[0] must propose a plan that meets certain statutory requirements laid down in § 1396a(a). The plan must establish a schedule of payment rates or payment methods for the various kinds of medical care that a Medicaid patient may seek. § 1396a(a)(30). All parties agree that these rates are almost

---

[0]The term "state" or "states" in the remainder of this opinion refers to a state or states participating in the Medicaid program.

5

always lower than the rates established under Medicare as reasonable costs and charges. Medicaid service providers (including doctors and hospitals) must accept the Medicaid payment as payment in full, and may not ask the Medicaid patient to pay any money beyond that amount. § 1320a-7b(d); 42 C.F.R. §447.15 (1993). To become effective, the plan must be approved by the Secretary of the United States Department of Health and Human Services ("the Secretary"). § 1396a(b).

Some individuals are eligible for benefits under both the Medicare and Medicaid Acts: they are either old-aged or disabled, and they are poor. These individuals are commonly called "dual eligibles." But some old-aged or disabled may not be poor enough to be eligible for Medicaid benefits. Moreover, for those dual eligibles who meet the Medicaid poverty requirement but cannot pay for Medicare Part B coverage, Medicaid may not provide for all the services covered by Medicare Part B.

C.

Since the very inception of the Medicare and Medicaid programs, Congress has made several attempts to solve the problems as sketched above. As a result, several provisions in the Medicaid Act, see 42 U.S.C. §§ 1396a(a)(15) (repealed 1988), 1396a(a)(10)(E), 1396d(p), 1396a(n), established an interplay between the Medicare Act and the Medicaid Act.

Congress enacted § 1396a(a)(15) in 1965 which at first required states through their Medicaid programs to pay all of the Medicare Part A premiums for dual eligibles, and permitted states to impose part of the Part B cost-sharing on the individuals

6

based on their ability to pay.[0]  Congress eliminated this
distinction in 1967, permitting states to require dual eligibles
to share in the cost-sharing for both Part A and Part B
coverage.[0]  This amendment did not affect the command that
together dual eligibles and states were to pay the Part B cost-
sharing in full.  See New York City Health & Hosps. Corp. v.
Perales, 954 F.2d 854, 860 (2d Cir.), cert. denied, ___ U.S. ___,
113 S. Ct. 461 (1992) (interpreting § 1396a(a)(15)).

In 1986, Congress permitted states to pay the Part B
cost-sharing for those Medicare-eligible individuals who are too
poor to pay the Part B cost-sharing on their own, but not poor
enough to be Medicaid-eligible, who are termed "qualified
Medicare beneficiaries (QMBs)."  This is called the optional

_____

[0]In 1965, this provision read in part:
> (15) in the case of eligible individuals 65 years
> of age or older who are covered by either or both of
> the insurance programs established by title XVIII, [the
> State Medicaid plan must] provide--
>> (A) for meeting the full cost of any deductible
>> imposed with respect to any such individual under
>> the insurance program established by part A of
>> such title, and
>> (B) where, under the plan, all of any deductible,
>> cost sharing, or similar charge imposed with
>> respect to any such individual under the insurance
>> program established by part B of such title is not
>> met, the portion thereof which is met shall be
>> determined on a basis reasonably related
>> (determined in accordance with standards approved
>> by the Secretary and included in the plan) to such
>> individual's income or his income and resources.

Social Security Amendments of 1965, Pub. L. No. 89-97, § 121(a),
79 Stat. 286, 346 (repealed 1988).
[0]This was accomplished by deleting § 1396a(a)(15)(A), and the
reference to "Part B" in § 1396a(a)(15)(B).  See Social Security
Amendments of 1967, Pub. L. No. 90-248, § 235(a)(3), 81 Stat.
821, 908.

"buy-in" program whereby the states may pay the Part B cost-sharing for the individuals to enroll them in the Medicare Part B program.  See the Omnibus Budget Reconciliation Act of 1986 (OBRA '86), Pub. L. No. 99-509, § 9403, 100 Stat. 1874, 2053-55 (codified as amended at §§ 1396a(a)(10)(E), 1396d(p), 1396a(n)).  The dispute of this case focuses on these provisions.

Section 1396a(a)(10)(E) provided that the states have an option whether to provide Part B cost-sharing to a QMB.  The statute specifically used the language of "at the option of a State."  Id., 100 Stat. at 2053 (repealed).  A QMB was essentially defined in § 1396d(p)(1) as a Medicare-eligible individual whose income is below the federal poverty line but "who, but for section [1396a(a)(10)(E)] and the election of the State, is not eligible for medical assistance under the [Medicaid] plan."  Id., 100 Stat. 2054.  Section § 1396d(p)(3) defines cost-sharing as including Part B premiums, coinsurance and deductibles and certain other enrollment premiums.  Section 1396a(n) states that a state plan may provide a payment amount for Part B services exceeding the amount otherwise payable under a Medicaid plan.

The participation in the QMB program was low.  By 1988 only one State had chosen to provide this benefit to QMBs.  H.R. Rep. No. 105(II), 100th Cong., 2d Sess. 59 (1988), reprinted in 1988 U.S.C.C.A.N. 857, 882.  Concerned about this low participation, and recognizing that Medicare coverage was being expanded to cover certain services that were previously covered by Medicaid, giving states certain savings, Congress made the

8

option to provide Medicare Part B benefits for the QMBs mandatory by requiring the states to pay the Part B cost-sharing for the QMBs.  See id. at 59-60, reprinted in 1988 U.S.C.C.A.N. at 882-83.  This was accomplished by deleting "at the option of a State" from § 1396a(a)(10)(E).  Medicare Catastrophic Coverage Act of 1988 (MCCA), Pub. L. No. 100-360, § 301(a)(1), 102 Stat. 683, 748.  No other substantive changes were made.  In the same year, the QMB definition was broadened by repealing § 1396d(p)(1)(B).  The Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, § 8434(a), 102 Stat. 3342, 3805.  That is, this amendment has the effect of making all dual eligibles QMBs.  For the sake of clarity, we will refer to these individuals covered by the current definition of QMB as "QMBs and dual eligibles." Section 1396a(a)(15), which covered only dual eligibles, was deleted by the Family Support Act of 1988, Pub. L. No. 100-485, Title VI, § 608(a)(14)(I)(iii), 102 Stat. 2343, 2416.

In 1989 Congress added § 1396a(a)(10)(E)(ii) which mandates that participating states pay the cost-sharing for certain qualified disabled and working individuals described in §1396d(s) but limited the payment to only one item as listed in §1396d(p)(3)(A)(i).  Pub. L. No. 101-239, § 6408(d)(1), 103 Stat. 2106, 2268 (1989).  In 1990 Congress added § 1396a(a)(10)(E)(iii) which requires participating states to extend certain QMB benefits to those Medicare-eligible individuals who are above the federal poverty line, but specifically limits these benefits to Part B premiums only.  Pub. L. No. 101-508, § 4501(b)(3), 104 Stat. 1388, 1388-165 (1990).

9

In 1989 Congress further amended the Medicare Act to require that physicians treating QMBs accept assignment, thereby precluding physicians from balance-billing[0] QMBs. Pub. L. No. 101-239, § 6102(a), 103 Stat. 2106, 2181-82 (1989) (codified at 42 U.S.C. § 1395w-4(g)(3)(A)). This provision took effect on April 1, 1990. Id. § 6101, 103 Stat. 2168-69.

D.

The State of Pennsylvania is a participant in the Medicaid program and has established a Medicaid plan which was approved by the Secretary. Pennsylvania pays the QMBs' Medicare Part B premiums in full, and pays the Medicare Part B deductible and coinsurance only if, and to the extent that, the amount already paid under Medicare Part B, plus its payment, does not exceed the Medicaid allowance. An applicable Pennsylvania regulation provides in part that "[i]f a [Medicaid] recipient also has Medicare coverage, the [State] may be billed for charges that Medicare applied to the deductible or coinsurance, or both. Payment will be made in accordance with established [Medicaid] rates and fees." 55 Pa. Code § 1101.64(b).

It appears that this regulation leads to a result that Pennsylvania pays nothing once the patient's deductible has been exhausted and pays at its lower Medicaid rates, rather than the Medicare rates, before the deductible has been exhausted.[0] See

_____

[0]Balance-billing is the practice whereby a provider bills the patient directly for the balance of the reasonable costs and charges if the Medicare or Medicaid program does not pay the full amount of the reasonable costs and charges.
[0]Under Medicaid, physicians are not permitted to bill the patient for the balance of the bill.

App. at 35 (Stipulation ¶ 23). However, the Secretary and the Pennsylvania Secretary of Public Welfare argue that Pennsylvania is permitted to limit its coinsurance and deductible payments under Medicare Part B so that the total amount of the reimbursements does not exceed the amount that the health care provider would have received for the services rendered under Medicaid. Although there may be some slight differences between the Pennsylvania regulation and the position the Secretary asserts before us, we will treat them as the same. Any difference is immaterial in the context of this appeal because our holding requires payment of all Part B cost-sharing.

Under the Pennsylvania payment system, Pennsylvania invariably pays little or no money for QMBs' Part B cost-sharing because the Medicaid rates are invariably lower than the Medicare rates, and are almost always lower than the Part B payment rates, i.e., 80% of the Medicare rates. Health care providers who supply services to QMBs in Pennsylvania thus may not recover the Part B cost-sharing that non-QMB Medicare Part B patients would pay on their own to service providers.

## II.

The question presented is whether the Pennsylvania plan and regulations (the "Penn Plan") limiting Medicaid payment to the extent that the Medicaid payment, plus Medicare payment, does not exceed the payment otherwise available under Medicaid violates either the Medicare Act or the Medicaid Act. We hold that the Penn Plan violates both the Medicare Act and the buy-in provisions of the Medicaid Act. In so holding, we find support

11

in the statutory language, statutory context and legislative history, as well as <u>New York City Health & Hosps. Corp. v. Perales</u>, 954 F.2d 854 (2d Cir.), <u>cert. denied</u>, ___ U.S. ___, 113 S. Ct. 461 (1992), a decision of the Court of Appeals for the Second Circuit, the only court of appeals that has tackled the precise question before us.[0]

A.

Under the Medicare Act, the Secretary is authorized to determine the reasonable costs or charges for Medicare Part B services. 42 U.S.C. § 1395w-4(b). Once the reasonable costs and charges are determined, a provider of Medicare services is entitled to recover 100% of the reasonable amount: 80% from the federal government, § 1395<u>l</u>, and 20% from the patient, §1395cc(a)(2)(A). <u>See also</u> §§ 1395w-4(a)(1), 1395u(b)(3)(B). No matter from whom, "providers who furnish medical care to Medicare-eligible patients have the right to collect 100% of their reasonable costs or charges." <u>Perales</u>, 954 F.2d at 858. Furthermore, the Medicare Act contains no exception to the reimbursement of 100% of the reasonable costs and charges for QMBs and dual eligibles. <u>Id.</u> The Pennsylvania limitation on payment of Part B cost-sharing in effect creates an exception to the reimbursement for QMBs and dual eligibles. This violates the Medicare Act. <u>See id.</u>

---

[0]A district court in the Fourth Circuit took the same position as the Court of Appeals for the Second Circuit. <u>See</u> <u>Rehabilitation Ass'n of Va., Inc. v. Kozlowski</u>, 838 F. Supp. 243, 247-54 (E.D. Va. 1993). Another district court took the contrary view. <u>See</u> <u>Haynes Ambulance Serv., Inc. v. Alabama</u>, 820 F. Supp. 590, 592-95 (M.D. Ala. 1993).

12

The Secretary argues that QMBs and dual eligibles should be treated as primarily Medicaid rather than Medicare patients.  We disagree.  The obvious fact is that Congress did not by statute make QMBs Medicaid-eligible (namely, receiving Medicaid services).  By requiring the states to enroll QMBs and dual eligibles in the Medicare Part B program, Congress thereby made them eligible for Medicare Part B benefits.  The statutory language is simply not susceptible of a reading that QMBs and dual eligibles are primarily Medicaid patients.  As the Perales court articulated,

> The Secretary's interpretation of dual eligibles as primarily Medicaid patients leads to some oddities.  If Medicaid alone controlled with respect to dual eligibles, then it would make little sense for Medicare Part B to pay 80% of the Medicare rate for crossover care.  If Medicaid were in fact the controlling program, then one would expect providers to be compensated at the Medicaid rate, instead of at 80% of the Medicare rate.  Moreover, if crossovers [dual eligibles] were "primarily Medicaid patients," there would be no basis for Medicare to allow (as it does), as a hospital's bad debt expense, the uncollected Medicare cost-sharing amounts.

Perales, 954 F.2d at 858-59.

Legislative history indicates that Congress intended that QMBs would be considered Medicaid beneficiaries primarily

13

for one purpose only--the provision of federal matching fund. Congress explained that

> Unlike those elderly and disabled covered under section 4602, individuals receiving assistance with Medicare cost-sharing obligations would not be treated as Medicaid beneficiaries for all purposes. However, as in the case of the elderly and disabled covered under section 4602, a State opting to offer this more limited coverage would receive Federal matching payments for its expenditures on behalf of these individuals.

H.R. Rep. No. 727, 99th Cong., 2d Sess. 105 (1986), reprinted in 1986 U.S.C.C.A.N. 3607, 3695.

Thus both the statutory framework and legislative history reflect that Congress intended QMBs to be Medicare patients rather than Medicaid patients. However, because QMBs are poor and cannot financially shoulder the burden of paying the Medicare Part B cost-sharing as can non-QMBs, Congress required the states opting to cover QMBs to stand in the shoes of QMBs with respect to the Part B cost-sharing payments. See id. at 106, reprinted in 1986 U.S.C.C.A.N. at 3696 ("For elderly and disabled individuals whom the State chose to cover, the Medicaid program would pay for the Part B deductible and the beneficiary's 20 percent coinsurance on Part B services.").

Accordingly, Medicare Part B service providers who supply service to QMBs are entitled to recover 100% of the reasonable costs and charges. The Penn Plan violates the Medicare Act by limiting its payment of Part B cost-sharing to

14

the extent that its payment, plus the Medicare payment, would not exceed the payment otherwise available under the Medicaid Act.

B.

Concluding that the Pennsylvania limitation on payment of the Part B cost-sharing violates the Medicare Act does not end the matter. The Secretary contends that Pennsylvania is permitted by the buy-in provisions in the Medicaid Act, §1396a(a)(10)(E)(i), 1396a(n), to limit its QMB Part B cost-sharing payment to the extent that its payment, plus Medicare Part B payment, does not exceed the Medicaid payment that would otherwise be payable under the Medicaid plan. If so, we must resolve the conflict between the buy-in provisions of the Medicaid Act and the Medicare Act. However, the appellants contend that the buy-in provisions, especially § 1396d(p)(3), require the states participating in the Medicaid program to pay the full amount of the Part B cost-sharing as defined in §1396d(p)(3). We agree with the appellants and see no conflict between the Medicare Act and the buy-in provisions of the Medicaid Act.

(a)

We are called upon to determine the meaning of the buy-in provisions of the Medicaid Act, §§ 1396a(a)(10)(E)(i), 1396d(p)(3), 1396a(n). "The task of resolving the dispute over the meaning of [a statute] begins . . . with the language of the statute itself." United States v. Ron Pair Enters., Inc., 489 U.S. 235, 241, 109 S. Ct. 1026, 1030 (1989). Accordingly, we

15

must first examine the language of the relevant statutory provisions.

> The current version of § 1396a(a)(10)(E)(i) provides:
> A State plan for medical assistance must . .
> (10) provide --
>     (E)  (i) for making medical assistance available
>          for medicare cost-sharing (as defined in
>          section 1396d(p)(3) of this title) for
>          qualified medicare beneficiaries described in
>          section 1396d(p)(1) of this title;
>     . . .

except that . . . (VIII) the medical assistance made available to a qualified medicare beneficiary described in section 1396d(p)(1) of this title who is only entitled to medical assistance because the individual is such a beneficiary shall be limited to medical assistance for medicare cost-sharing (described in section 1396d(p)(3) of this title), subject to the provisions of subsection (n) of this section and section 1396o(b). . . .

§ 1396a(a)(10)(E)(i). Section 1396o(b) is not implicated in this case. Section 1396d(p)(1) essentially defines the term "qualified medicare beneficiary (QMB)" as an individual who is eligible for Medicare Part A and who has an income below the federal poverty line. Section § 1396d(p)(3) states:

> The term "medicare cost-sharing" means the following costs incurred with respect to a qualified medicare beneficiary, without regard to whether the costs incurred were for items and services for which medical assistance is otherwise available under the plan:
>     (A)(i) premiums under section 1395i-2 or 1395i-2a of this title, and
>     (ii) premiums under section 1395r of this title.

(B) Coinsurance under subchapter XVIII of this chapter (including coinsurance described in section 1395e of this title).
(C) Deductibles established under subchapter XVIII of this chapter (including those described in section 1395e and section 1395l(b) of this title).
(D) The difference between the amount that is paid under section 1395l(a) of this title and the amount that would be paid under such section if any reference to "80 percent" therein were deemed a reference to "100 percent".

Such term also may include, at the option of a State, premiums for enrollment of a qualified medicare beneficiary with an eligible organization under section 1395mm of this title.

§ 1396d(p)(3). This definition includes all of the cost-sharing that a non-QMB Medicare Part B patient would have to pay in order to obtain Part B coverage. Part B deductibles are included in §1396d(p)(3)(C). Subsection (p)(3)(D) obviously refers to the 20% coinsurance payment. Section 1396a(n) is entitled "Payment amounts." It provides that

In the case of medical assistance furnished under this subchapter for medicare cost-sharing respecting the furnishing of a service or item to a qualified medicare beneficiary, the State plan <u>may</u> provide payment in an amount with respect to the service or item that results in the sum of such payment amount and any amount of payment made under subchapter XVIII of this chapter [Medicare Part B] with respect to the service or item exceeding the amount that is otherwise payable under the State plan for the item or service for eligible

17

individuals who are not qualified medicare
beneficiaries.

§ 1396a(n) (emphasis added).

"The apparent meaning" of § 1396d(p)(3), read together with § 1396a(a)(10)(E)(i), according to the Perales court, is that "the states that participate in Medicaid must allocate Medicaid funds to the enrollment of all dual eligibles and QMBs in Part B of Medicare and to the payment of 20% of reasonable costs or charges along with the annual deductibles incurred in this program." Perales, 954 F.2d at 859. We agree. Section 1396a(a)(10)(E)(i) uses the term "must" to impose an obligation on the states participating in the Medicaid program to pay the Medicare Part B cost-sharing, and the scope of that obligation is defined by § 1396d(p)(3).[0] The logical reading of these provisions is that a Medicaid plan must pay everything listed in § 1396d(p)(3) unless this section qualifies the obligation. Section 1396d(p)(3)(A)(ii) lists Part B premiums. Section 1396d(p)(3)(C) lists Part B deductibles. Section 1396d(p)(3)(D) specifically includes the 20% coinsurance that is the responsibility of a non-QMB Medicare Part B patient. Because §1396d(p)(3) does not contain any qualification on the obligation to pay the Part B cost-sharing, § 1396a(a)(10)(E)(i) therefore obligates states participating in Medicaid to pay the entire amount of the Part B cost-sharing.

---

[0] The state Medicaid plans may impose only a nominal cost-sharing on QMBs. See § 1396o(a) (imposition of certain charges in case of individuals described in § 1396a(a)(10)(E)(i)).

The Secretary points out that the statutory language itself does not state that the states must make payments in full. We believe the explicit language of "payment in full" is unnecessary in this context. Since § 1396d(p)(3) lists the Part B premiums, the deductibles and the 20% coinsurance as part of the scope of payment obligation, § 1396a(a)(10)(E)(i) which imposes the payment obligation requires payment for the entire amount of the Part B premiums, the deductibles and the 20% coinsurance unless otherwise specifically qualified. Such a qualification is absent from the § 1396d(p)(3). We thus read §§1396a(a)(10)(E)(i) and § 1396d(p)(3) as requiring payment in full. This was obviously the understanding of Congress when it enacted the QMB program. The contemporaneous legislative history language expressly and specifically stated that the states opting to provide the QMB benefits must make payment in full either to the provider or to the QMB. H.R. Rep. No. 727, 99th Cong., 2d Sess. 106, reprinted in 1986 U.S.C.C.A.N. 3607, 3696 ("the Medicaid program would pay for the Part B deductible and the beneficiary's 20 percent coinsurance on Part B services" to the provider if it took assignment, or to the beneficiary who would "submit the claim for the 20% coinsurance requirement to the State Medicaid programs").

The Secretary contends that because § 1396a(n), which is titled "Payment amounts," uses the permissible term "may" rather than "must," we should not read the requirement to pay Part B cost-sharing as a requirement of paying 100% of the Part B cost-sharing. We disagree.

In rejecting the Secretary's interpretation the <u>Perales</u> court stated:

>A statute requiring Medicaid funds to be made available for Medicare cost-sharing can only sensibly be read as requiring the funds to be made available to cover <u>all</u> Medicare cost-sharing. It is counter-intuitive that a statute requiring Medicaid funds to be made available for cost-sharing only to the extent of the Medicaid scheduled rates would not specify that qualification expressly. Furthermore, it appears that the reason that section a(n) authorizes payment beyond the Medicaid amount, when it is required by another section, is to clarify that the Medicaid Act does not prohibit a provider from accepting more than the Medicaid rate.

954 F.2d at 859 (footnote omitted).

The <u>Perales</u> court is correct in stating that had Congress intended a qualification on the amount of the payment, it would have specifically so stated. The statutory context bears this out. In one instance in the "buy-in" provisions, Congress expressly specified what part of the cost-sharing is optional for the state. In the last paragraph of § 1396d(p)(3), Congress stated that cost-sharing "also may include, at the option of a State, premiums for enrollment of a [QMB] with an eligible organization under section 1395mm of this title." §1396d(p)(3) (§ 1395mm is part of Part C). In other instances, Congress specifically limited the payment of cost-sharing to one

20

of the items listed in § 1396d(p)(3), with respect to certain non-QMB individuals. See § 1396a(a)(10)(E) (ii) (limiting cost-sharing payments for certain individuals to premiums described in § 1396d(p)(3)(A)(i)); 1396a(a)(10)(E)(iii) (limiting cost-sharing payments for individuals whose income is above the federal poverty line to premiums described in § 1396d(p)(3)(A)(ii)). This statutory context strongly indicates that if Congress wanted the payment to deviate from those Part B cost-sharing items listed in § 1396d(p)(3), it would have specifically so stated. The fact that these subsections within §§ 1396a(a)(10)(E), 1396d(p)(3) expressly provide for optional payment or limitations on the payment supports the conclusion that if Congress intended to permit the states to choose among the Part B cost-sharing items to pay or to pay a certain percentage of an item, it surely would have expressly so provided.

Moreover, we note that the Secretary does not argue the states may pay only part of the Part B premium. She only argues that the states may pay only part of the deductible and/or coinsurance. Accordingly, the Secretary would have us read a statute which on the face equally applies to the Part B premium, deductible and coinsurance in a manner so as to permit disparate treatment for the Part B premium, deductible and coinsurance. We reject this proposition. We have found no basis in the statutory language, context or legislative history for treating the Part B cost-sharing items differently. Congress did not state that under § 1396a(a)(10)(E)(i) the states may choose to pay an item

21

or part of an item out of those listed in § 1396d(p)(3), i.e., the Part B premiums, coinsurance and deductibles.

We believe § 1396a(n) was intended not to give states the discretion to pay the Part B cost-sharing, but rather to serve another important purpose in the context of the Medicaid Act: to give the states the authority to make payments pursuant to the rates set forth under the Medicare Act rather than those set forth in the Medicaid plans, that is, to deviate from the Medicaid payment schedules or payment methods. As is clear from the Medicaid Act, a state plan must set forth a payment schedule or payment methods for certain services. § 1396a(a)(30); 42 C.F.R. § 447.201(b), 447.203(a) (1993). Federal funding is limited to expenditures made pursuant to such schedules or payment methods established in a plan. § 1396b(a)(1) (the Secretary shall pay the federal share of the "total amount expended during such quarter as medical assistance under the State [Medicaid] plan"). States may not subsequently deviate from these payment schedules or payment methods without losing the right to receive federal funding. See id.; §§ 1396c, 1316. Section 1396a(n) authorizes the states to deviate from their schedules or payment methods with respect to QMB Part B cost-sharing payments, thus carving out an exception to the general requirement to comply with the Medicaid fee schedules or payment methods. Without the authorization under § 1396a(n), there would be an apparent conflict between § 1396a(a)(10)(E)(i) and the command that states only make payments according to their schedules or payment methods as approved by the Secretary. The

22

legislative history buttresses this reading.  The House Report stated that "the total of Medicaid payments for Medicare cost-sharing charges under this provision together with Medicare payments may exceed the amounts otherwise payable under the State Medicaid plan for such services."  H.R. Conf. Rep. No. 1012, 99th Cong., 2d Sess. 395-96 (1986), reprinted in 1986 U.S.C.C.A.N. 3868, 4040-41.  This language emphasizes the comparison between the Medicare and Medicaid rates of payment, rather than the discretion of the states.

Even assuming that § 1396a(n) authorizes the states to make discretionary payments, as the Secretary argues, this would at best lead to a conflict between § 1396a(a)(10)(E)(i) and §1396a(n).  Given this conflict, the Secretary would not necessarily prevail.  Any conflict, if it exists, must be resolved under the relevant statutory interpretation principles. We must do so by giving full effect to all provisions.  It is well settled that "[s]tatutory construction is a holistic endeavor . . . and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter."  United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc., ___ U.S. ___, ___, 113 S. Ct. 2173, 2182 (1993) (internal quotation marks and citations omitted).  Put another way, "`[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy.'"  Id. (quoting United States v. Heirs of Boisdore, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849)).  "[W]e are

23

obligated to give effect, if possible, to every word Congress used." Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S. Ct. 2326, 2331 (1979). That is, "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." 2A Norman J. Singer, Sutherland Statutory Construction § 46.06, at 119-20 (5th ed. 1992) (citations omitted).

Since § 1396a(a)(10)(E)(i) provides that states must pay the entire amount of the Part B cost-sharing, and § 1396a(n) provides that states may pay more than the Medicaid amounts, both sections may be reconciled by interpreting them as requiring payment for the entire amount of the Part B cost-sharing. Such a reading gives full effect to both and does no harm to either. On the other hand, permitting payment up to only the Medicaid rates would do irreconcilable harm to § 1396a(a)(10)(E)(i) which requires payment of the entire amount of the Part B cost-sharing.

However, we reiterate that such a conflict resolution is not necessary here because, as we concluded above, there is simply no conflict: § 1396a(n) serves no purpose other than giving the states the authority to deviate from the Medicaid payment schedules or payment methods. Reading § 1396a(n) this way gives full effect to this section without engendering a conflict between it and § 1396a(a)(10)(E)(i).

Our reading of the statutory provisions is confirmed by congressional intent as expressed in 1986. Congress itself did not read § 1396(a)(n) as authorizing states to make discretionary payments in excess of Medicaid rates. Nor did Congress intend

24

for this provision to detract from the command stated in §1396a(a)(10)(E)(i). When Congress enacted both § 1396a(a)(10)(E) and § 1396a(n) in 1986, it explained that a state must pay 100% of the Part B cost-sharing if it opted to enroll QMBs in Medicare Part B. This cannot be more clearly stated than the House Report:

> For elderly and disabled individuals whom the State chose to cover, the Medicaid program would pay for the Part B deductible and the beneficiary's 20 percent coinsurance on Part B services. If the beneficiary uses a physician who takes assignment, Medicaid would pay the physician directly for the 20 percent coinsurance and the patient could not be billed for any amounts above the Medicare reasonable charge. However, if the physician elects not to take assignment, the beneficiary would submit the claim for the 20 percent coinsurance requirement to the State Medicaid program and would be liable for an additional amount charged by the physician.

H.R. Rep. No. 727, 99th Cong., 2d Sess. 106 (1986), <u>reprinted</u> <u>in</u> 1986 U.S.C.C.A.N. 3607, 3696. This House Report clearly indicated that in addition to the Part B deductibles, the Medicaid program must pay the 20% coinsurance payments for Part B services either to the physician or to the patient directly. Obviously, § 1396a(a)(10)(E) and 1396a(n), which were enacted by Congress together in 1986, were understood by Congress as requiring the states to pay 100% of the Part B cost-sharing, if

25

the states decided to participate in the QMB program.  That is to say, the option for the states is whether to join or not to join, and not how much they have to pay.  Once the states joined the QMBs program, they were required to pay 100% of the Part B cost-sharing, including the 20% coinsurance payment.

Since § 1963a(n) was not understood by Congress in 1986 to give states opting to participate in the QMB program the discretion to pay only a portion of the Part B cost-sharing, it cannot be read to give such discretion in 1994 when no change has been made to § 1396a(n) or any other operative provisions with respect to the scope of the Part B cost-sharing payment.  The evolution of the statutory provisions demonstrate that Congress has not made any substantive amendment to those operative provisions with respect to how much the states must pay under §§1396a(a)(10)(E)(i), 1396d(p)(3) and § 1396a(n).  The change concerns whether the states have to pay at all.  It merely eliminated the states' option whether or not to join the program.  Now the states have no option; they must join.  See H.R. Conf. Rep. No. 661, 100th Cong., 2d Sess. 253 (1988), reprinted in 1988 U.S.C.C.A.N. 923, 1031 (the amendment "[m]akes mandatory the current option for States to pay Medicare premiums, deductibles and coinsurance").  This change in the option to join or not to join does not affect the amount that the states are obligated to pay.  Therefore, the statute's established meaning as to how much a state Medicaid plan must pay (that is, requiring payment of all Part B cost-sharing) must be adhered to.  It would be a strange way to make a change in the content of an existing statutory

26

provision regarding the scope of payment without ever so slightly modifying the language of those provisions specifying how much a state must pay. Cf. Pierce v. Underwood, 487 U.S. 552, 567, 108 S. Ct. 2541, 2551 (1988) ("Quite obviously, reenacting precisely the same language would be a strange way to make a change."). The Secretary neither explicitly argues nor provides a rationale for the proposition that changing the option whether or not to pay the Part B cost-sharing at all into a mandate to pay somehow changed the amount of the Part B cost-sharing which the states are required to pay, where the statute defining the scope of the payment had not been amended at all. She completely ignores the House Report written in 1986 which explained the scope of Part B cost-sharing payment.

Nor does the amendment broadening the definition of QMB as including dual eligibles previously covered by § 1396a(a)(15) substantively affect the operative provisions relating to the obligation to pay all the Part B cost-sharing. First, no matter what treatment dual eligibles received under § 1396a(a)(15), they now receive the same treatment as QMBs under § 1396a(a)(10)(E)(i) because they are brought under the coverage of §1396a(a)(10)(E)(i). QMBs were not brought into the coverage of §1396a(a)(15). The plain fact is that § 1396a(a)(15) was repealed.

Moreover, § 1396a(a)(15) had been construed by the Secretary as requiring states and dual eligibles combined to pay the Part B cost-sharing in full at least until 1983, as set forth in a 1981 memorandum and in the Secretary's position before a

27

district court in a 1983 case. See New York City Health & Hosps. Corp. v. Perales, 954 F.2d 854, 861-62 (2d Cir. 1992) (summarizing the Secretary's position). In Perales, the Court of Appeals for the Second Circuit interpreted this provision, then already repealed, as meaning "if the state chooses not to pay the entire [Part B] cost-sharing amount, the state must pay what remains after patients are allocated that portion of the liability commensurate with their ability to pay." Id. at 860. The legislative history indicates that Congress intended that the individuals were to "share in the cost," S. Rep. No. 404, 89th Cong., 1st Sess. 80 (1965), reprinted in 1965 U.S.C.C.A.N. 1943, 2020, with the state. Together, dual eligibles and states were to pay the Part B cost sharing in full. Thus, before dual eligibles were brought into the coverage of § 1396a(a)(10)(E)(i), they were treated as favorably as QMBs. To the extent that the repealed § 1396a(a)(15) had any relevance to the interpretation of § 1396a(a)(10)(E)(i), it is consistent with our reading of the latter. Perales, 954 F.2d at 860.[0]

(b)

To support its position that § 1396a(n) permits the states to pay only a portion of the Part B cost-sharing, the Secretary relies heavily on certain language[0] in a House Report

---

[0]But see Samuel v. California Dept. of Health Serv., 570 F. Supp. 566, 570 & n.2, 571 (N.D. Cal. 1983) (amended 572 F. Supp. 273 (1983)).

[0] The House Report stated:

> The bill would require States to pay Medicare cost-sharing, including coinsurance, on behalf of eligible individuals. It is the understanding of the Committee that, with respect to dual Medicaid-Medicare eligibles,

28

that was written in 1988 when Congress deleted the "at the option of a State" language from § 1396a(a)(10)(E).  The language as set out in footnote 10 purported to recognize a state practice of not paying the full amount of Part B cost-sharing.  Obviously that language addressed the state practice relating to dual eligibles.  That is, the practice mentioned therein is a practice under §1396a(a)(15).  See Perales, 954 F.2d at 861.  Its relevance to §1396a(a)(10)(E)(i) is obscure at best.  First, there was no state practice as to QMB Part B cost-sharing payments under §1396a(a)(10)(E).  It is not clear how much states actually paid for the Part B cost-sharing for QMBs at that time, because "[w]hile States could protect this population [QMBs] through the

some States pay the coinsurance even if the amount that Medicare pays for the service is higher than the State Medicaid payment rate, while others do not.  Under the Committee bill, States would not be required to pay the Medicare coinsurance in the case of a bill where the amount reimbursed by Medicare--i.e., 80 percent of the reasonable charge--exceeds the amount Medicaid would pay for the same item or service.  However, if a State chooses to pay some or all of the coinsurance in this circumstance, Federal matching funds would, as under current law, be available for this cost.  For example, assume that a physician actually charges a "buy-in" patient $60 for performing a particular procedure; that Medicare recognizes $50 as the reasonable charge; and that the State Medicaid program only pays $35 for this procedure.  Whether or not the physician takes assignment, Medicare will pay only 80 percent of $50, leaving a $10 coinsurance obligation for the beneficiary.  However, since the State only recognizes $35 as the fee for the procedure in question, and since the Medicare program has already paid the physician $40, the State is not required to pay any of the $10 coinsurance.  If the State chooses to pay some or all of the $10, however, its cost would qualify for Federal matching payments at the regular rate for services.

H.R. Rep. No. 105(II), 100th Cong., 2d Sess. 61 (1988), reprinted in 1988 U.S.C.C.A.N. 857, 884.

29

Medicaid `buy-in' option under current law, it is the Committee's understanding that, to date, only one State [had] chosen to implement this coverage."  H.R. Rep. No. 105(II) at 59, reprinted in 1988 U.S.C.C.A.N. at 882 (emphasis added).[0]  Second, as stated above, in 1988 Congress did not amend the operative provisions related to how much states should pay, but only mandated that the states participate in the QMB program. Finally, the language of the House Report, quoted in footnote 10, expressly refers to "dual Medicaid-Medicare eligibles" and not to "QMBs."

As the Perales court pointed out, the 1988 House Report language did not purport to interpret § 1396a(a)(15).  Perales, 954 F.2d at 861.  It merely took notice of a state practice of not paying the Part B cost-sharing in full for dual eligibles. Because § 1396a(a)(15) has been repealed, that language has little value.  Nor did that language purport to interpret §1396a(a)(10)(E)(i) or § 1396d(p)(3) as to the scope of the states' obligation to make payments for the Part B cost-sharing.

The Perales court rejected the Secretary's reliance on the 1988 legislative history language for the additional reason that it is post-enactment legislative history. Perales, 954 F.2d at 861.  We agree.  The legislative history relied upon by the Secretary is not post-enactment history as to the mandate requiring the states to join the QMB program, but this mandate does not affect the amount of the payment.  The legislative

---

[0]By letter dated May 12, 1994 (p. 9), the Secretary informed us that she did not know how the one state which elected the optional coverage of QMBs treated the coinsurance amounts.

30

history is post-enactment history as far as the payment amount is concerned because Congress did not make any substantive amendments to the operative provisions related to the scope of the Part B cost-sharing payment at the time the House Report was written.  The House Report purported to comment on the language that was not drafted by the reporting Committee in 1988 because this language was already in the statute after the enactment of OBRA '86.  See Pierce v. Underwood, 487 U.S. 552, 568, 108 S. Ct. 2541, 2551 (1988).

Post-enactment legislative history is not a reliable source for guidance.  "[E]ven when a subsequent House Committee has actually commented upon an earlier statute, the interpretation carries little weight with the courts." Perales, 954 F.2d at 861.  As the Supreme Court teaches, "[t]he views of a subsequent Congress form a hazardous basis for inferring intent of an earlier one." Untied States v. Price, 361 U.S. 304, 313 80 S. Ct. 326, 332 (1960).

We will disregard, as the Perales court did, the legislative history relied upon by the Secretary.  The Supreme Court has rejected attempts to smuggle subsequent legislative commentary into an existing statute. Pierce, 487 U.S. at 566-68, 108 S. Ct. at 2551; Consumer Product Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 116-20, 100 S. Ct. 2051, 2060-64 (1980); see also City of Chicago v. Environmental Defense Fund, ___ U.S. ___, 114 S. Ct. 1588, 1593 (1994).  We do the same in this case, not simply because of the Supreme Court's general warning regarding the troublesome nature of subsequent

31

legislative history, but also because there are more specific problems with relying upon the 1988 House Report.

Similar to those legislative materials discounted by the Supreme Court in GTE Sylvania, Inc. and Pierce, the 1988 House Report commented on language that was not drafted by the reporting Committee. The fact that in 1988 Congress deleted "at the option of a State" from § 1396a(10)(E)(i) does not change the fact that the 1988 reporting Committee did not draft the provisions relating to the scope of payment. These provisions were enacted in 1986. The Pierce Court disregarded legislative comments made on the meaning of "substantially justified" in 28 U.S.C. § 2412(d)(1)(A), a provision which was contemporaneously reenacted as those comments were written, although it was drafted and enacted by a previous Congress to take effect provisionally for five years. 487 U.S. at 566-68, 108 S. Ct. at 2551. Since those comments were not given any weight by the Supreme Court in Pierce, we will not give any weight to the comments in the 1988 House Report when Congress did not reenact or amend the provisions defining the scope of payment. See also GTE Sylvania, Inc., 447 U.S. at 118 n.13, 100 S. Ct. at 2061 n.13 ("[E]ven when it would otherwise be useful, subsequent legislative history will rarely override a reasonable interpretation of a statute that can be gleaned from its language and legislative history prior to its enactment.").

Moreover, the Secretary's interpretation of the 1988 House Report language directly conflicts with language in the 1986 House Report explaining that the states must pay the 20%

32

coinsurance either to the service provider if it took assignment or to the QMB if the provider did not take assignment.  H.R. Rep. No. 727 at 106, reprinted in 1986 U.S.C.C.A.N. at 3696.  This conflict weakens any force of the Secretary's reliance on the post hoc 1988 legislative history.  See Pierce, 487 U.S. at 567, 108 S. Ct. at 2551.

Finally, the value of the 1988 House Report language cited by the Secretary is further reduced because it, as interpreted by the Secretary as giving states discretion to pay only part of the deductibles, apparently conflicts with language in another section of the same House Report, which purported to illustrate the QMB program in the context of prescription drug benefits.  See H.R. Rep. No. 105(II) at 50-51, reprinted in 1988 U.S.C.C.A.N. at 873-74.  There the House Report stated that the entire amount of the drug deductible must be paid by states to service providers or patients who would pay to the service providers, or that states may provide the actual drugs.[0]  The

---

[0] The House Report stated:

> The Committee bill would require States, through their Medicaid programs, to cover both the Medicare Part B premium (including any increment attributable to the prescription drug benefit), as well as the $500 prescription drug deductible, for all elderly and disabled Medicare beneficiaries with incomes below 100 percent of the Federal poverty guidelines. . . .  The purpose of this provision, which parallels the general Medicaid "buy-in" requirement found at section 208 of the Committee bill, is to assure effective protection against catastrophic drug costs for poor Medicare beneficiaries.
> With respect to coverage of the deductible, the bill would give the States two options.  A State could either offer the Medicare beneficiary the same prescription drug benefit that it offers to its

33

Secretary maintains that the legislative history language she cites[0] permits states to pay only part of the Part B deductibles. See App. at 35 (Stipulation ¶ 23). The statutory provision[0] and

---

> categorically needy Medicaid eligibles until the deductible is satisfied and Medicare coverage begins. Or, it could simply reimburse the beneficiary directly for the charges incurred for prescription drugs up to $500. Whatever method the State selects must apply to all qualified Medicare beneficiaries. If the State elected to offer its Medicaid prescription drug benefit, the calculation of whether the Medicare deductible had been satisfied would have to be based on the actual charges for the drugs used, not on the amounts that the State actually reimbursed for the drugs through its Medicaid program.
> State expenditures for Medicare prescription drug premiums and deductibles would be subject to Federal Medicaid matching payments at the State's regular matching rate for services. This buy-in requirement would, on July 1, 1988, take effect whether or not implementing regulations have been issued. Thus, States would begin paying the monthly Part B premium increments beginning July 1988, and would begin assisting qualified beneficiaries to meet the deductible with respect to drugs dispensed on or after January 1, 1989.

H.R. Rep. No. 105(II) at 50-51, reprinted in 1988 U.S.C.C.A.N. at 873-74.

[0] See supra note 10.

[0] The statute provided that states may treat drug deductibles as one of the deductibles listed in § 1396d(p)(3)(C) (the buy-in provision) which states must pay for, or states must provide QMBs with drugs under the Medicaid program until the cost of the drugs reached the amount of the deductible:

> In a State which provides medical assistance for prescribed drugs under section 1396d(a)(12), instead of providing to qualified medicare beneficiaries, under paragraph (3)(C), medicare cost-sharing with respect to the annual deductible for covered outpatient drugs under section 1395m(c)(1), the State may provide to such beneficiaries, before charges for covered outpatient drugs for a year reach such deductible amount, benefits for prescribed drugs in the same amount, duration, and scope as the benefits made available under the State plan for individuals described in section 1396a(a)(10)(A)(i).

the legislative history language regarding drug benefits[0] make clear that states had two options to satisfy the obligation to pay for the drug deductibles: either to provide drugs in kind or reimburse $500 under the buy-in provision §1396d(p)(3)(C). Neither option excuses the state from paying the full $500. It is clear Congress envisioned the drug deductibles as part of the Part B cost-sharing listed in § 1396d(p)(3)(C), not as a special benefit separate from that provided by the buy-in provision. See § 1396d(p)(4), Pub. L. No. 100-360, §301(d)(2), 102 Stat. 671, 749 (1988) (repealed 1990) (referring to § 1396d(p)(3)(C)). Assuming that the language relied upon by the Secretary could be read to allow states to pay only part of any item of the Part B cost-sharing listed in § 1396d(p)(3), that reading conflicts with the language regarding the drug benefits. The fact that § 1396d(p)(4) as set out in note 14, <u>supra</u>, was repealed subsequently, <u>see</u> Pub. L. No. 101-234, § 201(a)(1), (b)(2), (e), 103 Stat. 1981, 1985 (1989), does not eliminate the conflict between the legislative comments as they existed in 1988. Such commentary, therefore, at most exhibited confusion on the part of the reporting Committee, which is one of the reasons why such <u>post hoc</u> comments should not be given much weight.

The post-enactment legislative history language relied upon by the Secretary thus conflicts with a logical reading of the statutory provisions, with contemporaneous legislative

---

42 U.S.C. § 1396d(p)(4), Pub. L. No. 100-360, § 301(d)(2), 102 Stat. 671, 749 (1988) (repealed 1990, Pub. L. No. 101-234, §201(a)(1), (b)(2), (e), 103 Stat. 1981, 1985 (1989)).
[0]<u>See</u> <u>supra</u> note 12.

history, as well as language in another section of the same House Report. "Even in the ordinary situation, [a] House Report would not suffice to fix the meaning of language which that reporting Committee did not even draft." Pierce, 487 U.S. at 567, 108 S. Ct. at 2551. Given all the problems discussed above, we will give no effect to the subsequent legislative history language relied upon by the Secretary.

(c)

The Secretary and the district court also relied upon §1395w-4(g)(3)(A), a statutory provision enacted in 1989 which requires providers to take assignment of payment with respect to the services provided to QMBs. See Pub. L. No. 101-239, §6102(a), 103 Stat. 2181-82. This requirement took effect in April 1990. Id. § 6101, 103 Stat. 2169. This section, which only set forth a payment method, should not affect the interpretation of how much the states must pay under §1396a(a)(10)(E). Indeed, the legislative history states that the amendment "does not change the current policy regarding the amount which a Medicaid program must reimburse on such claims." H.R. Rep. No. 247, 101st Cong., 1st Sess. 364, reprinted in 1989 U.S.C.C.A.N. 1906, 2090. Because taking assignment itself does not affect the amount of payment, particularly if the payment amount is considered to be the whole amount of the Part B cost-sharing, taking assignment means only that providers are to receive the whole amount from the states, rather than from QMBs in whole or in part. The fact that between 1988 and April 1990, service providers were permitted to balance-bill QMBs indicates

36

congressional intent that service providers be entitled to collect the deductibles and the 20% coinsurance in full, if not from the Medicaid plans, then from QMBs.  A statutory provision obligating service providers to take assignment and prohibiting balance-billing does not reduce the amount of the payment but regulates where the payment can come from.[0]

The Secretary and the district court also relied upon the legislative history language relevant to § 1395w-4(g)(3)(A) which again asserted that there was a current practice of not paying Part B cost-sharing in full.  See H.R. Rep. No. 247 at 364, reprinted in 1989 U.S.C.C.A.N. at 2090.  This reliance is misplaced for the same reasons that reliance upon the 1988 House Report is misplaced.  See supra Part II.B(b).

We also note that the ban on balance-billing appears to apply only to an item of service that is covered by a Medicaid state plan.  See § 1395w-4(g)(3)(A) ("Payment for physicians' services . . . with respect to such services under a State plan approved [by the Secretary] may only be made on an assignment-related basis" (emphasis added)).  It appears, therefore, that this provision does not apply to an item of service that is not available under a State plan but available under Medicare Part B. We do not know whether in such a situation a provider may

---

[0]For the same reason, we believe the legislative history language indicating that Congress intended to codify the practice relating to the dual eligibles, see H.R. Rep. No. 247 at 364, reprinted in 1989 U.S.C.C.A.N. at 2090, refers only to the method of payment, not the amount of payment.  The codification addresses from where the payment comes and from whom service providers may seek payment, not about how much that payment could be.

balance-bill a QMB patient.  We need not decide this question; it suffices to point out that the Secretary's reliance on this provision is fraught with problems.

(d)

Finally, the Secretary's interpretation leads to an odd result and defeats congressional intent in creating the QMB program.  The odd result is that if an item of service is available under Medicare Part B but not Medicaid, then no payment is required by the buy-in provisions of the Medicaid Act; the states have no basis to make any payment calculations.  This is exactly what the Secretary by regulation provides:  "State payment of Part B premiums on behalf of a Medicaid recipient does not obligate it to pay on the recipient's behalf the Part B deductible and coinsurance amounts for those Medicare Part B services not covered in the Medicaid State plan."  42 C.F.R. §431.625(c)(1) (1993).  We believe this result contradicts clear statutory command that states pay the Part B cost-sharing including deductibles and coinsurance payments on behalf of QMBs, regardless of whether an item of Part B service is available under Medicaid.  See § 1396d(p)(3)("without regard to whether the costs incurred were for items and services for which medical assistance is otherwise available under the [Medicaid] plan").  The language, context and history of the buy-in provisions of the Medicaid Act do not permit viewing the obligation to pay the Part B cost-sharing as depending upon whether an item of service is available under Medicaid.

38

Moreover, because the Medicaid rates are invariably lower that than those under Medicare Part B, the Secretary's interpretation would lead to the result that states almost always would not have to pay any amount at all. This conflicts with the congressional intent in creating the QMB program: to put the states opting to participate in the program in the shoes of QMBs with respect to the responsibility for the Part B cost-sharing payments. See H.R. Rep. No. 727 at 106, reprinted in 1986 U.S.C.C.A.N. at 3696 ("For elderly and disabled individuals whom the State chose to cover, the Medicaid program would pay for the Part B deductible and the beneficiary's 20 percent co-insurance on Part B services."). In so doing, Congress took notice of the fact that the Medicare beneficiaries faced substantial out of pocket expenses. See id. at 102-03, reprinted in 1986 U.S.C.C.A.N. at 3692-93. QMBs were so poor that they could not afford the Part B cost-sharing as did non-QMBs in order to obtain Medicare Part B services, nor were they poor enough to obtain certain coverage under Medicaid. The buy-in provisions thus were designed to alleviate this plight of QMBs by requiring the states to pay for the out of pocket expenses for them, if the states opted to join the QMB program.

When changing the option into a mandate to join the QMB program by deleting "at the option of a State" from §1396a(a)(10)(E)(i), Congress was motivated primarily by one consideration: the savings for the Medicaid programs that would result from the expansion of Medicare coverage to services previously covered by Medicaid. The House Committee on Energy

39

and Commerce believed that expansions in the Medicare program to be made by the 1988 amendments would provide states with a windfall of savings.  See H.R. Rep. 105 (II) at 59-60, reprinted in 1988 U.S.C.C.A.N. at 882-83.  To channel that windfall into the QMB program was the intent behind the 1988 amendment: "In the view of the Committee, this Medicaid `windfall' should be redirected toward catastrophic protection for the elderly and disabled poor.  Accordingly, the Committee bill would essentially make mandatory the Medicaid `buy-in' option in current law."  Id. Thus, forcing states to use the windfall savings to pay for the QMB Part B cost-sharing was the unmistakable purpose of the 1988 amendment.  The Secretary's interpretation would require service providers to foot the bill rather than redirecting the Medicaid "windfall" to pay for the Part B cost-sharing, thus defeating the congressional intent in passing the amendment in 1988.[0]

### III.

The Secretary contends that she should be given deference under Chevron, U.S.A., Inc., v. Natural Resources Defense, 467 U.S. 837, 104 S. Ct. 2778 (1984).  The Chevron rule is predicated on the fact "the statute is silent or ambiguous with respect to the specific issue."  Id. at 843, 104 S. Ct. at 2782.  Our analysis reflects that although interpreting the relevant statutory provisions is not a simple task, there is in

---

[0]We do not know whether the windfall referred to in the House Report still exists at present time.  If not, the states may have considerable burden in providing payments for the Part B cost-sharing.  Such a problem, if it indeed exists, must be resolved by Congress through corrective legislation, rather than by us through questionable judicial interpretation of the statute.

40

fact no ambiguity as to how much states have to pay. Complexity alone is not enough to trigger Chevron. As our discussion makes clear, the statutory language, context and legislative history demonstrate that Congress has spoken on the issue. Accordingly, Chevron has no application. INS v. Cardoza-Fonseca, 480 U.S. 421, 446-48, 107 S. Ct. 1207, 1221 (1987); Chevron, 467 U.S. at 843 & n.9, 104 S. Ct. at 2781 & n.9; Perales, 954 F.2d at 861.

Moreover, we note that the Secretary has changed her position with respect to the issue of how much states must pay for dual eligibles and QMBs. As the Perales court stated:

> In a 1981 policy memorandum, the Secretary announced
> that with respect to dual eligibles who have buy-in
> Medicare coverage, "if the MediCal [Medicaid] agency
> has made no payment at all, the physician/supplier may
> collect coinsurance [i.e. 20% of reasonable charges]
> and deductibles from the MediCal . . . eligible
> patient." Department of Health & Human Services
> Memorandum, September 29, 1981.

954 F.2d at 862 (alteration in Perales). The Secretary urged the same position in a case before a district court at about the same time. Id. This makes clear that the Secretary "presumed that providers have the right to receive 100% of their reasonable costs or charges for services to patients enrolled in Part B Medicare pursuant to a buy-in arrangement, a right that providers could assert even against indigent, Medicaid-eligible patients." Id.

41

The Secretary's change of position erodes the confidence that a court should have when it defers to the judgment of another decisionmaker. "An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is `entitled to considerably less deference' than a consistently held agency view." INS v. Cardoza-Fonseca, 480 U.S. at 446 n.30, 107 S. Ct. at 1221 (citations omitted). See also Perales, 954 F.2d at 861; Samaritan Health Serv. v. Bowen, 811 F.2d 1524, 1529 (D.C. Cir. 1987) ("[a]ny deference that an interpretative rule may claim depends on [among other things] . . . `its consistency with earlier and later pronouncements.'" (quoting Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S. Ct. 161, 164 (1944)). Applying these principles, we will not give any deference to the Secretary's new position.[0]

## IV.

For the foregoing reasons, we hold that Pennsylvania must pay the entire amount of the Part B cost-sharing on behalf of QMBs. We will reverse the judgment of the district court and remand the case with instructions that the district court enter judgment for the appellants.

---

[0] In Thomas Jefferson University v. Shalala, ____ U.S. ____, 62 U.S.L.W. 4601, 1994 W.L. 276674 (U.S. June 24, 1994), the Supreme Court gave substantial deference to the Secretary's interpretation of her own regulation, namely, 42 C.F.R. §413.85(c) (1993). As that case does not involve an issue of the Secretary's interpretation of a statute, it has no relevance to our analysis in the case sub judice.