[No. S098409. June 2, 2003.]

CIMMARON OLSZEWSKI, a Minor, etc., Plaintiff and Appellant, v. SCRIPPS HEALTH, Defendant and Respondent.

800

## Counsel

Chavez & Gertler, Mark A. Chavez, Kim E. Card; Blumenthal Ostroff & Markham, Law Offices of Sheldon A. Ostroff, Sheldon A. Ostroff, David R. Markham; Law Offices of Thomas J. Brandi and Thomas J. Brandi for Plaintiff and Appellant.

Manjusha P. Kulkarni; Kimberly Lewis; Rebecca S. Gudeman; and Marilyn Holle for National Health Law Program, Western Center on Law & Poverty, National Center for Youth Law and Protection & Advocacy, Inc., as Amici Curiae on behalf of Plaintiff and Appellant.

The Sturdevant Law Firm, James C. Sturdevant, Mark T. Johnson; Hinton & Alfert and Scott H.Z. Sumner for Consumer Attorneys of California as Amici Curiae on behalf of Plaintiff and Appellant.

Friestad & Giles, Deborah Giles and Leticia O. Trujillo for Defendant and Respondent.

Manatt, Phelps & Phillips, Barry S. Landsberg, Harvey L. Rochman and Wendy M. Conole for Catholic Healthcare West and The Regents of the University of California as Amici Curiae on behalf of Defendant and Respondent.

Catherine I. Hanson and Astrid G. Meghrigian for the California Medical Association as Amicus Curiae on behalf of Defendant and Respondent.

Lois Richardson for California Healthcare Association as Amicus Curiae on behalf of Defendant and Respondent.

Stream & Stream, Theodore K. Stream, Jamie E. Wrage and Tera Harden for Loma Linda University Medical Center, Inc., as Amicus Curiae on behalf of Defendants and Respondents.

## OPINION

BROWN, J.—As a participant in the federal Medicaid program, the State of California has agreed to abide by certain requirements imposed by federal law in return for federal financial assistance in furnishing medical care to the needy. (See *Harris v. McRae* (1980) 448 U.S. 297, 308 [100 S.Ct. 2671, 2683, 65 L.Ed.2d 784].) The California Medical Assistance Program, Medi-Cal (Welf. & Inst. Code, §§ 14000-14198),[1] "represents California's implementation of the federal Medicaid program . . . ." (*Robert F. Kennedy Medical Center v. Belshé* (1996) 13 Cal.4th 748, 751 [55 Cal.Rptr.2d 107, 919 P.2d 721].) In implementing Medi-Cal, our Legislature has enacted statutes authorizing a health care provider to assert and collect on a lien for the full cost of its services against "any judgment, award, or settlement obtained by" a Medicaid beneficiary. (§ 14124.791; see also § 14124.74.)

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

The Legislature enacted these statutes to alleviate the fiscal difficulties faced by health care providers who, due to Medi-Cal payment limits, did not receive full compensation for services rendered to Medicaid beneficiaries (see Legis. Counsel's Dig., Assem. Bill No. 812 (1985-1986 Reg. Sess.) 4 Stats. 1985, Summary Dig., p. 241), and to give these providers an incentive "to seek out third-party liability sources" (Assem. Health Com., Rep. on Assem. Bill No. 812 (1985-1986 Reg. Sess.) Apr. 30, 1985, p. 2). As originally enacted in 1985, section 14124.791 allowed a provider to first bill Medi-Cal and, after receiving payment from Medi-Cal, "to file a lien for the amount of unpaid charges against any judgment, award, or settlement obtained by the beneficiary . . . ." (Stats. 1985, ch. 776, § 5, p. 2515.) Recognizing that this balance billing[2] provision might conflict with federal law, however, the Legislature provided that "[t]he provisions for which appropriate federal waivers cannot be obtained [such as section 14124.791] shall not be implemented." (Stats. 1985, ch. 776, § 6, p. 2515.)

Because no federal waivers were obtained, the 1985 version of section 14124.791 was never implemented. (See Assem. Ways & Means Com., Republican analysis of Sen. Bill. No. 1719 (1991-1992 Reg. Sess.) Aug. 31, 1992, p. 1.) In 1992, the Legislature sought to rectify this problem by revising section 14124.791. Under the 1992 version, a provider could recover on a lien "against any judgment, award, or settlement obtained by the [Medicaid] beneficiary" for the full cost of its services *only after* refunding the Medi-Cal payment. (§ 14124.791.) Thus, the 1992 version permitted substitute billing—where the provider substitutes recovery from a judgment or settlement obtained by the beneficiary for recovery from Medi-Cal—and not balance billing. Unlike in 1985, the Legislature did not condition implementation of the 1992 version on the receipt of appropriate federal waivers.

Today we consider the constitutionality of the 1992 version of the provider lien statute in the context of a lawsuit filed by a Medi-Cal beneficiary against her medical provider. In this case, the health care provider filed a lien pursuant to section 14124.791 against the Medi-Cal beneficiary. Challenging the legality of the provider's practice of filing such liens, the beneficiary filed a class action lawsuit against the provider, alleging unfair competition and various tort claims. As the basis for her claims, the beneficiary contended federal law preempted section 14124.791 and rendered invalid any liens filed pursuant to that section. The trial court dismissed the action, holding that federal Medicaid law did not preempt section 14124.791. We now conclude that the trial court erred in part because federal law does preempt California's provider lien statutes. Nonetheless, we

---

[2]As explained by the Court of Appeal, balance billing is "the practice of billing patients for the balance remaining on a medical bill after deducting the amount paid by Medi-Cal."

affirm the judgment of the trial court dismissing the class action with prejudice because the claims either fall within the safe harbor described in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*), or are barred by the litigation privilege contained in Civil Code section 47, subdivision (b).

## FACTS

Because we review this case after the trial court sustained a general demurrer, we accept as true all material allegations of the complaint. (See *Charles J. Vacanti, M.D., Inc. v. State Comp. Ins. Fund* (2001) 24 Cal.4th 800, 807 [102 Cal.Rptr.2d 562, 14 P.3d 234].) The complaint alleges the following facts:

Cimarron Olszewski (plaintiff) is a minor and a Medi-Cal beneficiary who received emergency medical care from Scripps Health (defendant), a medical care provider that participates in the Medi-Cal program. Defendant received and accepted Medi-Cal payments for the medical care it provided to plaintiff. Defendant, either directly or through its collection agent, Medical Liabilities Recoveries, Inc. (MLR) (collectively defendants),[3] also asserted a lien against "the personal injury claims, judgments or settlements of" plaintiff pursuant to Welfare and Institutions Code section 14124.791 and Civil Code section 3045.1.

In response, plaintiff filed this class action, alleging that defendants had no legal right to assert and collect on such liens in light of federal Medicaid law governing provider reimbursement and third party liability. Plaintiff asserted causes of action for (1) violations of the unfair competition law (hereafter UCL; Bus. & Prof. Code, § 17200 et seq.), (2) trespass to chattels, (3) negligent misrepresentation, and (4) fraud. In addition to restitution and damages, plaintiff sought an order declaring that the liens asserted by defendants against her and the other class members were "unlawful, unenforceable, and uncollectible" because federal law preempted the California statutes authorizing these liens. Plaintiff also sought to enjoin defendants from asserting these liens in the future.

Defendants demurred, and the trial court sustained the demurrers without leave to amend. The court concluded that defendants had a statutory right to assert the liens under section 14124.791 and that federal law did not preempt this statutory right. The court also held that plaintiff's tort claims were

---

[3]Because we stayed the action as to MLR after it filed for bankruptcy, the opinion refers to Scripps Health as defendant and Scripps Health and MLR collectively as defendants.

barred because the filing of the liens was "a privileged communication protected by Civil Code [section] 47[, subdivision] (b)(2)."

The Court of Appeal disagreed with the trial court on the preemption issue and concluded that federal Medicaid law preempted section 14124.791. The court, however, agreed that plaintiff's claims were barred because (1) section 14124.791 provided a safe harbor from plaintiff's UCL claim under *Cel-Tech, supra,* 20 Cal.4th at page 182; and (2) defendants' assertion of the liens was protected by the litigation privilege. In determining the proper disposition, the court concluded that the trial court had found an "imbedded claim for declaratory relief as to the validity of section 14124.791" and had "declared section 14124.791 was not preempted by federal law" and defendants' lien against plaintiff was valid. The Court of Appeal then modified the declaratory relief portion of the trial court's judgment to reflect its findings that federal law preempted section 14124.791 and defendants' lien was invalid and unenforceable and affirmed the judgment "as so modified."

Both plaintiff and defendants petitioned this court and we granted review.

DISCUSSION

I

A

As an initial matter, we find that the Court of Appeal acted properly in modifying the judgment to include a declaration that defendants' lien against plaintiff was invalid, but erred in adding a declaration that federal law preempted section 14124.791. In her complaint, plaintiff adequately pled a claim for declaratory relief under Code of Civil Procedure section 1060 even though she did not separately identify such a cause of action. (*Bank of America etc. Assn. v. Gillett* (1940) 36 Cal.App.2d 453, 455 [97 P.2d 875] [affirming a judgment awarding declaratory relief even though the plaintiff failed to "designate[] his complaint one for 'Declaratory Relief' "]; see also 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 810, p. 265 ["because there are no forms of action, a declaration of rights will be upheld if the complaint states sufficient facts even though the pleader did not think he was proceeding under C.C.P. 1060 and did not appropriately label his complaint"].) The complaint asked the court to adjudge the rights and duties of plaintiff and defendants with respect to defendants' lien and alleged facts establishing an "actual controversy" appropriate for declaratory relief. (*Wellenkamp v. Bank of America* (1978) 21 Cal.3d 943, 947 [148 Cal.Rptr. 379, 582 P.2d 970].) As such, plaintiff was entitled to a declaration of her

rights and duties under defendants' lien. (See *Gillett,* at p. 455.) And, upon concluding that defendants' lien against plaintiff was invalid and unenforceable, the Court of Appeal properly modified the judgment to include a declaration to that effect. (See *Essick v. City of Los Angeles* (1950) 34 Cal.2d 614, 624-625 [213 P.2d 492] [modifying a judgment to include declaratory relief even though the trial court dismissed the complaint without specifically awarding declaratory relief].)

The Court of Appeal, however, erred by modifying the judgment to include a declaration addressing the constitutionality of section 14124.791. In her complaint, plaintiff never sought a declaration that federal law preempted section 14124.791; she only sought a declaration that defendants' liens were invalid. Thus, in modifying the judgment, the court should have only included a declaration that defendants' lien against plaintiff was invalid, unenforceable, and uncollectible—and not that section 14124.791 was preempted.

Nonetheless, the Court of Appeal did not exceed its jurisdiction by deciding the preemption issue. In a convoluted argument, defendant contends the court's erroneous resolution of the "imbedded" declaratory relief claim somehow invalidated its finding of preemption because defendant had no opportunity to litigate the claim. Defendant is mistaken. In determining whether defendants' lien was invalid, the Court of Appeal had to determine whether federal law preempted California's provider lien statutes. Moreover, the trial court, in sustaining the demurrers, expressly held that federal law did not preempt section 14124.791. Thus, the Court of Appeal properly considered and decided the preemption issue in reviewing the trial court's order sustaining the demurrers. In any event, defendant fully briefed the preemption issue before the Court of Appeal and the trial court. Under these circumstances, defendant can hardly claim that it lacked an adequate opportunity to litigate the preemption issue.

B

██ Similarly, defendant's contention that the Court of Appeal erred by deciding the federal preemption issue without making the State of California a party to this action must be rejected. Code of Civil Procedure section 389, subdivision (a) states in relevant part that "[a] person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if . . . in his absence complete relief cannot be accorded among those already parties . . . ." Thus, "[a] person is an indispensable party [only] when the judgment to be rendered necessarily must affect his rights."

(*Hartman Ranch Co. v. Associated Oil Co.* (1937) 10 Cal.2d 232, 262 [73 P.2d 1163].) In this case, the court could grant the relief requested by plaintiff without injuring or affecting the rights of the State of California. Plaintiff did not assert an imbedded claim for declaratory relief seeking to invalidate section 14124.791. (See *ante*, at p. 808.) Rather, she sought to invalidate the liens filed by defendants pursuant to that section.[4] The State of California had no interest in these liens and could not recover on them. The fact that an adverse ruling against defendants may have a financial impact on the state or require a finding that federal law preempts a California statute does not make the state an indispensable party. (See *Hartenstine v. Superior Court* (1987) 196 Cal.App.3d 206, 222 [241 Cal.Rptr. 756] [finding that the State of California was not an indispensable party despite its "interest in enforcing its laws"].)

## II

We now consider defendant's substantive challenge to the Court of Appeal's declaration that defendants' lien against plaintiff filed pursuant to section 14124.791 was invalid, unenforceable, and uncollectible. Plaintiff concedes that California law permits provider liens against "the personal injury claims, judgments or settlements" of Medicaid beneficiaries. She, however, contends these liens, such as the liens filed by defendants, are unenforceable because federal law preempts the statutes authorizing these liens. We agree.

### A

We begin with a brief overview of Medicaid and Medi-Cal. In 1965, Congress established Medicaid by enacting title XIX of the Social Security Act (42 U.S.C. §§ 1396-1396v; see *Schweiker v. Gray Panthers* (1981) 453 U.S. 34, 36 [101 S.Ct. 2633, 2636, 69 L.Ed.2d 460] (*Schweiker*)). "The Medicaid program . . . is a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons. Under this system of 'cooperative federalism,' [citation] if a State agrees to establish a Medicaid plan . . . the Federal Government agrees to pay a specified percentage of 'the total amount expended . . . as medical assistance under the State plan. . . .'" (*Harris v. McRae, supra,* 448 U.S. at p. 308 [100 S.Ct. at p. 2683].) Participation is voluntary, but "once a State elects to participate, it must comply with the requirements of Title XIX." (*Id.* at p. 301 [100 S.Ct. at p. 2680].)

Although the requirements of title XIX are described in detail in 42 United States Code section 1396a (see *Pennsylvania Medical Society v.*

---

[4]Plaintiff also sought restitution, damages, injunctive relief, and attorney fees and costs.

*Snider* (3d Cir. 1994) 29 F.3d 886, 889 (*Snider*)), construing these requirements is often easier said than done. "The Social Security Act is among the most intricate ever drafted by Congress. Its Byzantine construction . . . makes the Act 'almost unintelligible to the uninitiated.' " (*Schweiker, supra,* 453 U.S. at p. 43 [100 S.Ct. at p. 2640].) Indeed, a federal judge once described the Medicaid statutes as "an aggravated assault on the English language, resistant to attempts to understand it." (*Friedman v. Berger* (S.D.N.Y. 1976) 409 F.Supp. 1225, 1226, affd. (2d Cir. 1976) 547 F.2d 724.) Because of the extraordinary complexity of these statutes, Congress has "conferred on the Secretary [of Health and Human Services (hereafter Secretary)] exceptionally broad authority to prescribe standards for applying certain sections of the Act."[5] (*Schweiker,* at p. 43 [100 S.Ct. at p. 2640]; see, e.g., 42 U.S.C. § 1396a(a)(4)(A) ["[a] State plan for medical assistance must . . . [¶] . . . [¶] . . . provide . . . such methods of administration . . . as are found by the Secretary to be necessary for the proper and efficient operation of the plan"].) Regulations promulgated by the Secretary are therefore "entitled to 'legislative effect' " unless they exceed his or her statutory authority or are arbitrary or capricious. (*Schweiker,* at p. 44 [100 S.Ct. at p. 2640].) "State Medicaid plans must [therefore] comply with requirements imposed both by the [Social Security] Act itself and by the Secretary" (*id.* at p. 37 [100 S.Ct. at p. 2636]), and must "be approved by the Secretary" (*Elizabeth Blackwell Health Center v. Knoll* (3d Cir. 1995) 61 F.3d 170, 172 (*Elizabeth Blackwell Center*)).

Despite these requirements, "[t]he [Medicaid] program was designed to provide the states with a degree of flexibility in designing plans that meet their individual needs. [Citation.] As such, states are given considerable latitude in formulating the terms of their own medical assistance plans." (*Addis v. Whitburn* (7th Cir. 1998) 153 F.3d 836, 840.) "Congress intended that states be allowed flexibility in developing procedures for administering their statutory obligations under the Medicaid statute and their state plans." (*Elizabeth Blackwell Center, supra,* 61 F.3d at p. 178.)

■ With this backdrop in mind, we now turn to the Medicaid statutes and regulations governing provider reimbursement and third party liability. A state Medicaid plan must "establish a scheme for reimbursing health care providers for the medical services provided to needy individuals, and must require that payment for Medicaid services be made only to the provider of

---

[5]"The Secretary has delegated his rulemaking power to the Health Care Financing Administration (HCFA) [citation], now called the Centers for Medicare and Medicaid Services [citation]." (*Wisconsin Dept. of Health and Family Servs. v. Blumer* (2002) 534 U.S. 473, 479, fn. 1 [122 S.Ct. 962, 966, 151 L.Ed.2d 935, 186 A.L.R. Fed. 639].) For simplicity, the opinion refers to the Secretary as the entity charged with interpretive authority.

the services or, under certain conditions, to the recipient of the services." (*Banks v. Secretary of Indiana Family & Soc. Serv.* (7th Cir. 1993) 997 F.2d 231, 235; see also 42 U.S.C. § 1396a(a)(13); 42 C.F.R. § 447.10 (2002).)[6] The plan and the state agency administering that plan must ensure that the rate is "reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated facilities to provide services in conformity with State and Federal laws, regulations, and quality and safety standards." (42 C.F.R. § 447.250(a).) To receive reimbursement from a state Medicaid plan, a health care provider must enter into a provider agreement with the state Medicaid agency. (See 42 U.S.C. § 1396a(a)(27).)

Because "Medicaid is essentially a payer of last resort" (*Rehabilitation Ass'n of Va. v. Kozlowski* (4th Cir. 1994) 42 F.3d 1444, 1447), federal Medicaid law requires state plans to recover from liable third parties whenever possible. A " '[*t*]*hird party*' " is "any individual, entity or program that is or may be liable to pay all or part of the expenditures for medical assistance furnished under a State plan." (42 C.F.R. § 433.136, italics added.) The state Medicaid agency must "take all reasonable measures to ascertain the legal liability of third parties . . . ." (42 U.S.C. § 1396a(a)(25)(A).) "[I]n any case where such a legal liability is found to exist after medical assistance has been made available on behalf of the individual and where the amount of reimbursement the State can reasonably expect to recover exceeds the costs of such recovery, the State or local agency [must] seek reimbursement for such assistance to the extent of such legal liability . . . ." (42 U.S.C. § 1396a(a)(25)(B).) To that end, the state plan must provide for the mandatory assignment of the beneficiary's rights "to payment for medical care from any third party" to the state agency. (42 U.S.C. § 1396k(a)(1)(A); see also 42 U.S.C. § 1396a(a)(45); 42 C.F.R. §§ 433.145, 433.146.)

Thus, when a health care provider submits a Medicaid claim, the state Medicaid agency must first ascertain whether a third party may be liable. "If the agency has established the probable existence of third party liability at the time the claim is filed, the agency must reject the claim and return it to the provider for a determination of the amount of liability . . . . When the amount of liability is determined, the agency must then pay the claim to the extent that payment allowed under the agency's payment schedule exceeds the amount of the third party's payment."[7] (42 C.F.R. § 433.139(b)(1).) "If the probable existence of third party liability cannot be established or third party benefits are not available to pay the recipient's medical expenses at the

---

[6] Hereafter, all further citations to the Code of Federal Regulations are to the 2002 edition unless otherwise indicated.

[7] There are some exceptions not applicable here. (See 42 C.F.R. § 433.139(b)(2)-(3).)

time the claim is filed, the agency must pay the full amount allowed under the agency's payment schedule." (42 C.F.R. § 433.139(c).) The agency must then pursue "recovery of reimbursement" from that third party. (42 C.F.R. § 433.139(d)(2).)

While federal law requires the state Medicaid agency to obtain full reimbursement of Medicaid payments whenever possible, it strictly limits the ability of providers to obtain reimbursement for their services. Even though Medicaid payments are typically lower than the amounts normally charged by providers for their services (see *McAmis v. Wallace* (W.D.Va. 1997) 980 F.Supp. 181, 182), "[a] State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, *as payment in full,* the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual" (42 C.F.R. § 447.15, italics added).[8] Section 1396a(a)(25)(C) of title 42 United States Code Service then provides "that in the case of an individual who is entitled to medical assistance under the State plan with respect to a service for which a third party is liable for payment, the person furnishing the service *may not seek to collect from the individual* (or any financially responsible relative or representative of that individual) payment of an amount for that service" except under specific circumstances and in limited amounts defined by the statute.[9] (Italics added; see also 42 C.F.R. § 447.20(a).)[10]

---

[8] Title 42 Code of Federal Regulations part 447.15 states: "A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance or copayment required by the plan to be paid by the individual. However, the provider may not deny services to any eligible individual on account of the individual's inability to pay the cost sharing amount imposed by the plan in accordance with § 431.55(g) or § 447.53. The previous sentence does not apply to an individual who is able to pay. An individual's inability to pay does not eliminate his or her liability for the cost sharing charge."

[9] Title 42 United States Code Service section 1396a(a) states in part: "A State plan for medical assistance must— [¶] . . . [¶] (25) provide— [¶] . . . [¶] (C) that in the case of an individual who is entitled to medical assistance under the State plan with respect to a service for which a third party is liable for payment, the person furnishing the service may not seek to collect from the individual (or any financially responsible relative or representative of that individual) payment of an amount for that service (i) if the total of the amount of the liabilities of third parties for that service is at least equal to the amount payable for that service under the plan (disregarding section 1916 [42 USCS § 1396o]), or (ii) in an amount which exceeds the lesser of (I) the amount which may be collected under section 1916 [42 USCS § 1396o] or (II) the amount by which the amount payable for that service under the plan (disregarding section 1916 [42 USCS § 1396o]) exceeds the total of the amount of the liabilities of third parties for that service."

[10] Title 42 Code of Federal Regulations part 447.20(a) states: "A State plan must provide for the following: [¶] (a) In the case of an individual who is eligible for medical assistance under the plan for service(s) for which a third party or parties is liable for payment, if the total

To comply with these federal requirements, Medi-Cal has imposed certain limitations on provider reimbursement. Under section 14019.3, subdivision (c), "[u]pon presentation of the Medi-Cal card or other proof of eligibility, the provider shall submit a Medi-Cal claim for reimbursement . . . ." "Any provider of health care services who obtains a label or copy from the Medi-Cal card or other proof of eligibility . . . shall not seek reimbursement nor attempt to obtain payment for the cost of those covered health care services from the eligible applicant or recipient, or any person other than the department or a third-party payor who provides a contractual or legal entitlement to health care services." (§ 14019.4, subd. (a).)

Despite these limitations on provider reimbursement, section 14124.791, subdivision (a) provides: "Subject to the director's prior right of recovery, a provider who has rendered services to a beneficiary because of an injury for which a third party is liable and who has received payment under the Medi-Cal program shall be entitled to file a lien for all fees for services provided to the beneficiary against any judgment, award, or settlement obtained by the beneficiary or the director against that third party. A provider may only recover upon the lien if the provider has made a full reimbursement of any fees paid by the department [the state agency that administers Medi-Cal] for those services." "In the event of judgment or award in a suit or claim against a third party or carrier," the provider may collect on the lien.[11] (§ 14124.74.) We now consider whether federal law preempts these provider lien statutes.

amount of the established liability of the third party or parties for the service is— [¶] (1) Equal to or greater than the amount payable under the State plan (which includes, when applicable, cost-sharing payments provided for in §§ 447.53 through 447.56), the provider furnishing the service to the individual may not seek to collect from the individual (or any financially responsible relative or representative of that individual) any payment amount for that service; or [¶] (2) Less than the amount payable under the State plan (including cost sharing payments set forth in §§ 447.53 through 447.56), the provider furnishing the service to that individual may collect from the individual (or any financially responsible relative or representative of the individual) an amount which is the lesser of— [¶] (i) Any cost-sharing payment amount imposed upon the individual under §§ 447.53 through 447.56; or [¶] (ii) An amount which represents the difference between the amount payable under the State plan (which includes, where applicable, cost-sharing payments provided for in §§ 447.53 through 447.56) and the total of the established third party liability for the services."

[11]"If the action or claim is prosecuted by the beneficiary alone, . . . [a]fter payment of . . . expenses and attorney's fees the court or agency shall, on the application of the director, allow as a first lien against the amount of the settlement, judgment, or award the reasonable value of additional benefits provided to the beneficiary under the Medi-Cal program, as provided in subdivision (d) of Section 14124.72, and as a second lien, the amount of any claims, pursuant to Section 14019.3, owed to a provider, as provided in Section 14124.791." (§ 14124.74, subd. (a).) "If the action or claim is prosecuted both by the beneficiary and the director, . . . [a]fter payment of . . . expenses and attorney's fees, the court or agency shall first apply out of the balance of the judgment or award an amount sufficient to reimburse the director the full amount of the reasonable value of benefits provided on behalf of the

B

As acknowledged by plaintiff, sections 14124.791 and 14124.74 authorized the liens filed by defendant. Nonetheless, plaintiff contends the liens are unenforceable because federal Medicaid statutes and regulations limiting provider reimbursement—title 42 United States Code Service section 1396a(a)(25)(C) and 42 Code of Federal Regulations parts 447.15 and 447.20—preempt these California statutes.[12] We agree.

 Under the United States Constitution, the "Laws of the United States . . . shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (U.S. Const., art. VI, cl. 2.) "Since . . . *McCulloch* v. *Maryland* (1819) 17 U.S. (4 Wheat.) 316, 427 [4 L.Ed.2d 579, 606], 'it has been settled that state law that conflicts with federal law is "without effect." ' " (*Smiley* v. *Citibank* (1995) 11 Cal.4th 138, 147 [44 Cal.Rptr.2d 441, 900 P.2d 690] (*Smiley*), affd. (1996) 517 U.S. 735 [116 S.Ct. 1730, 135 L.Ed.2d 25], quoting *Cipollone* v. *Liggett Group, Inc.* (1992) 505 U.S. 504, 516 [112 S.Ct. 2608, 2617, 120 L.Ed.2d 407] (*Cipollone*).) And both federal statutes and regulations may have preemptive effect. (See *Fidelity Federal Sav. & Loan Assn.* v. *de la Cuesta* (1982) 458 U.S. 141, 153 [102 S.Ct. 3014, 3022, 73 L.Ed.2d 664] ["Federal regulations have no less pre-emptive effect than federal statutes"].)

A federal statute or regulation may preempt state law in three situations, commonly referred to as (1) express preemption, (2) field preemption, and (3) conflict preemption. " 'First, Congress can define explicitly the extent to which its enactments pre-empt state law.' [Citations.] 'Second, in the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively.' [Citations.] 'Finally, state law is pre-empted to the extent that it actually conflicts with federal law.' [Citations.]" (*Smiley, supra,* 11 Cal.4th at pp. 147-148, fn. omitted, quoting *English* v. *General Electric*

beneficiary under the Medi-Cal program, and then an amount sufficient to reimburse a provider who has filed a lien for any claims for services rendered to the beneficiary, as provided under Section 14124.791." (§ 14124.74, subd. (b).)

[12]Defendant notes that some courts have "questioned whether the Supremacy Clause even applies to spending power legislation like Medicaid." (See, e.g., *Westside Mothers* v. *Haveman* (E.D.Mich. 2002) 133 F.Supp.2d 549, 562, revd. (6th Cir. 2002) 289 F.3d 852, 865; *Brogdon ex rel. Cline* v. *National Healthcare Corp.* (N.D.Ga. 2000) 103 F.Supp.2d 1322, 1339 (*Brogdon*); but see *Frazar* v. *Gilbert* (5th Cir. 2002) 300 F.3d 530, 550 [finding that laws passed under Congress's spending clause powers are the supreme law of the land]; *Missouri Child Care Ass'n* v. *Cross* (8th Cir. 2002) 294 F.3d 1034, 1041 [same]; *Antrican* v. *Odom* (4th Cir. 2002) 290 F.3d 178, 188 [same].) Because defendants do not actually raise this issue, we decline to consider it here.

*Co.* (1990) 496 U.S. 72, 79 [110 S.Ct. 2270, 2275, 110 L.Ed.2d 65] (*English*).)

A state law actually conflicts with federal law "where it is impossible for a private party to comply with both state and federal requirements [citation], or where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " (*English, supra,* 496 U.S. at p. 79 [110 S.Ct. at p. 2275], quoting *Hines v. Davidowitz* (1941) 312 U.S. 52, 67 [61 S.Ct. 399, 404, 85 L.Ed. 581].) "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." (*Crosby v. National Foreign Trade Council* (2000) 530 U.S. 363, 373 [120 S.Ct. 2288, 2294, 147 L.Ed.2d 352].)

Although federal law may preempt state law, "[c]ourts are reluctant to infer preemption, and it is the burden of the party claiming that Congress intended to preempt state law to prove it." (*Elsworth v. Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 548 [208 Cal.Rptr. 874, 691 P.2d 630].) Where Congress has legislated in a field traditionally occupied by the states, "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." (*Rice v. Sante Fe Elevator Corp.* (1947) 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447].) "This assumption provides assurance that 'the federal-state balance' [citation] will not be disturbed unintentionally by Congress or unnecessarily by the courts." (*Jones v. Rath Packing Co.* (1977) 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604].) In applying this assumption, courts should narrowly interpret the scope of Congress's "intended invalidation of state law" whenever possible. (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [116 S.Ct. 2240, 2250, 135 L.Ed.2d 700] (*Medtronic*), see also *Cipollone, supra,* 505 U.S. at p. 518 [112 S.Ct. at p. 2618] [holding that the presumption against preemption "reinforces the appropriateness of a narrow reading of" the federal statute's preemptive effect].)

In this case, the California statutes at issue address a subject traditionally regulated by the states—public health and the costs of medical care. (See *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.* (1995) 514 U.S. 645, 661 [115 S.Ct. 1671, 1679-1680, 131 L.Ed.2d 695]; *Downhour v. Somani* (6th Cir. 1996) 85 F.3d 261, 265; *Medical Soc. of State of N.Y. v. Cuomo* (2d Cir. 1992) 976 F.2d 812, 816; *Brogdon, supra,* 103 F.Supp.2d at p. 1332.) "The regulation of public health and the cost of medical care are virtual paradigms of matters traditionally within the police powers of the state." (*Medical Soc.,* at p. 816.) This is true

even though California enacted these statutes as part of its implementation of the federal Medicaid program. Contrary to plaintiff's assertion, Medicaid is not a "field" traditionally legislated by Congress. Rather, by enacting the Medicaid statutes, Congress legislated in the field of public health—a field traditionally regulated by the states. (See *ibid.*) The presumption against preemption therefore applies. (*Rice v. Santa Fe Elevator Corp., supra*, 330 U.S. at p. 230 [67 S.Ct. at p. 1152].)

Indeed, the very nature of the Medicaid program triggers a presumption against preemption. The Medicaid program is "based on a scheme of cooperative federalism." (*King v. Smith* (1968) 392 U.S. 309, 316 [88 S.Ct. 2128, 2133, 20 L.Ed.2d 1118].) Under this scheme, a participating state creates and administers its own plan which must be approved by the Secretary. (See *Elizabeth Blackwell Center, supra*, 61 F.3d at pp. 172, 178.) Thus, the participating state works in tandem with the federal government in pursuit of a common purpose—the provision of medical care to the needy. "Where[, as here,] coordinate state and federal efforts exist within a complementary administrative framework, and in the pursuit of common purposes, the case for federal pre-emption becomes a less persuasive one." (*New York Dept. of Social Services v. Dublino* (1973) 413 U.S. 405, 421 [93 S.Ct. 2507, 2517, 37 L.Ed.2d 688].)

With these standards in mind, we now consider plaintiff's contention that federal Medicaid law actually conflicts with and therefore preempts California's provider lien statutes.

■ When determining the preemptive effect of federal law, we are guided by the United States Supreme Court's "oft-repeated comment . . . that '[t]he purpose of Congress is the ultimate touchstone' in every preemption case." (*Medtronic, supra*, 518 U.S. at p. 485 [116 S.Ct. at p. 2250], quoting *Retail Clerks v. Schermerhorn* (1963) 375 U.S. 96, 103 [84 S.Ct. 219, 222, 11 L.Ed.2d 179].) "Congress' intent, of course, primarily is discerned from the language of the pre-emption statute and the 'statutory framework' surrounding it." (*Medtronic*, at p. 486 [116 S.Ct. at pp. 2250-2251], quoting *Gade v. National Solid Wastes Management Assn.* (1992) 505 U.S. 88, 111 [112 S.Ct. 2374, 2390, 120 L.Ed.2d 73].) "Also relevant, however, is the 'structure and purpose of the statute as a whole,' [citation] as revealed not only in the text, but through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers, and the law." (*Medtronic*, at p. 486 [116 S.Ct. at p. 2251], quoting *Gade*, at p. 98 [112 S.Ct. at p. 2383].)

Where, as here, Congress enacted the preemption statute pursuant to its spending power, Congress must "speak with a clear voice . . . ." (*Pennhurst State School v. Halderman* (1981) 451 U.S. 1, 17 [101 S.Ct. 1531, 1540, 67 L.Ed.2d 694].) "[I]f Congress desires to condition the States' receipt of federal funds, it 'must do so unambiguously . . . enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'" (*South Dakota v. Dole* (1987) 483 U.S. 203, 207 [107 S.Ct. 2793, 2796, 97 L.Ed.2d 171], quoting *Pennhurst*, at p. 17 [101 S.Ct. at p. 1540].) "There can . . . be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it." (*Pennhurst*, at p. 17 [101 S.Ct. at p. 1540].) Thus, in exercising its spending power, Congress must unambiguously state that it is imposing an obligation and clearly define the scope of that obligation. In light of this need for congressional clarity and the presumption against preemption, any ambiguity in the Medicaid statutes and regulations must be construed against preemption.

■ We therefore begin by reviewing the history and language of the relevant federal statutes and regulations. (See *Medtronic, supra*, 518 U.S. at p. 486 [116 S.Ct. at pp. 2250-2251].) In creating Medicaid, Congress sought "to provide medical assistance to persons whose income and resources are insufficient to meet the costs of necessary care and services." (*Atkins v. Rivera* (1986) 477 U.S. 154, 156 [106 S.Ct. 2456, 2458, 91 L.Ed.2d 131].) Congress also intended "[t]he program . . . to be the payor of last resort; that is, other available third party resources must be used before the Medicaid program pays for the care of an individual eligible for Medicaid." (Medicaid Program; State Plan Requirements and Other Provisions Relating to State Third Party Liability Programs, 55 Fed.Reg. 1423-1424 (Jan. 16, 1990).)

At the time Congress first enacted Medicaid, health care providers often supplemented below-cost payments from the state with contributions from the needy patient or his or her relatives. (See *Resident v. Noot* (Minn. 1981) 305 N.W.2d 311, 313.) Recognizing that any amount charged directly to a Medicaid beneficiary for medical services would "interfere with the [beneficiary's] access to the medical attention he needs" (*Yanez v. Jones* (D. Utah 1973) 361 F.Supp. 701, 706), the Secretary promulgated 45 Code of Federal Regulations part 249.31 (1969) which eventually became 42 Code of Federal Regulations part 447.15.[13] (See also Supplementation of Payments Made to Skilled Nursing Homes; Medical Assistance, Notice of Interim Policies and

---

[13]The regulation was originally published at 45 Code of Federal Regulations part 249.31 (1969). (See *Sargeant v. Commr. of Public Welfare* (1981) 383 Mass. 808 [423 N.E.2d 755, 761, fn. 12].) It was later moved to 42 Code of Federal Regulations part 250.30(a)(6) (1972) (see *Johnson's Professional Nursing Home v. Weinberger* (5th Cir. 1974) 490 F.2d 841, 843,

Requirements, 33 Fed.Reg. 14894-14895 (Oct. 4, 1968).) Like 42 Code of Federal Regulations part 447.15, this regulation forced state plans to require providers to accept the Medicaid payment as "payment in full" (45 C.F.R. § 249.31 (1969)) and to prohibit providers from recovering from the beneficiary any amount exceeding the Medicaid payment (see *Yanez*, at p. 706; *Sargeant v. Commr. of Public Welfare, supra*, 423 N.E.2d at p. 761, fn. 12.)

In the nursing home context, however, "many states were unable to bear the entire cost of providing medical care to the needy, notwithstanding the states' receipt of federal funds." (*Resident v. Noot, supra*, 305 N.W.2d at p. 313.) Congress acknowledged that these states "depend[ed] upon the supplementation of the State agency's below-cost allowances for care with contributions from relatives or the needy individual himself." (Sen.Rep. No. 744, 1st Sess. (1967), reprinted in 1967 U.S. Code Cong. & Admin. News, p. 3026.) But Congress concluded that "[a]s a matter of public policy, it would be best for all concerned: the needy individual, his relatives, the State agency, and the nursing home if the reimbursement made by the State represented the reasonable cost or reasonable charges for comparable services." (*Ibid.*) The Secretary therefore delayed the implementation of the payment in full requirement for nursing homes but required state plans to phase out their practice of supplementation within a reasonable period of time.[14] (See *Johnson's Professional Nursing Home v. Weinberger, supra*, 490 F.2d at p. 845; see also 33 Fed.Reg. 14895 (Oct. 4, 1968); Supplementation of Payments Made to Skilled Nursing Homes; State Plan Requirements, 34 Fed.Reg. 1397 (Jan. 29, 1969).)

In the 1970's and 1980's, Congress amended the Medicaid statutes to permit some cost-sharing charges, such as copayments and deductibles. Under these amendments, state plans could charge Medicaid beneficiaries certain nominal cost-sharing amounts. (See Medicaid Program; Imposition of Cost Sharing Charges Under Medicaid, 50 Fed.Reg. 23009 (May 30, 1985).) "The basic intent of providing States with the option of imposing

fn. 6) and then 42 Code of Federal Regulations part 450.30(a)(8), before it became part 447.15 of title 42 of the Code of Federal Regulations (43 Fed.Reg. 45185 (Sept. 29, 1978)).

[14]As originally enacted, 45 Code of Federal Regulations part 249.31 (1969) stated: "A State plan for medical assistance under title XIX of the Social Security Act must provide that participation in the program will be limited to providers of service who accept, as payment in full, the amounts paid in accordance with the fee structure, except that, with respect to payment for care furnished in skilled nursing homes, existing supplementation programs will be permitted until January 1, 1971, where the State has determined and advised the Secretary of Health, Education, and Welfare that its payments for skilled nursing home services furnished under the plan are less than the reasonable cost of such services permitted under Federal regulations, and the State has, prior to 1971, provided the Secretary with a plan for phasing out such supplementation within a reasonable period after January 1, 1971." (33 Fed.Reg. 14894 (Oct. 4, 1968).)

cost-sharing requirements . . . [was] to prevent [beneficiary] over-utilization of health care services covered under Medicaid by imposing a nominal payment obligation on [beneficiaries]." (55 Fed.Reg. 1429 (Jan. 16, 1990).) In 1985, Congress enacted 42 United States Code section 1396a(a)(25)(C) to clarify "the responsibility of Medicaid [beneficiaries] for copayments and deductibles when third parties are liable for payments on their behalf."[15] (Sen.Rep. No. 99-146, 2d Sess. (1985), reprinted in 1986 U.S. Code Cong. & Admin. News, pp. 279-280.)

Pursuant to section 1396a(a)(25)(C) of title 42 of the United States Code, the Secretary promulgated 42 Code of Federal Regulations part 447.20. "The intent of this provision [was] to protect the Medicaid [beneficiary] from being charged for a service in excess of the amounts allowed under the State plan after considering the third party's liability." (55 Fed.Reg. 1428 (Jan. 16, 1990).) Parts 447.15 and 447.20 of 42 Code of Federal Regulations therefore had complementary purposes. "Under § 447.15, the provider is limited to the amount paid by the agency plus any deductible, coinsurance or copayment required by the plan and is not entitled to collect additional payment from the State." (55 Fed.Reg. 1428 (Jan. 16, 1990).) Meanwhile, part 447.20 "prohibits the provider from seeking to collect from the Medicaid [beneficiary] any amount that exceeds the amount, if any, allowed as [beneficiary] liability in the State plan (§ 447.20(a))." (55 Fed.Reg. 1428 (Jan. 16, 1990).)

As evidenced by this legislative history, the Secretary clearly intended to bar a health care provider from recovering from a Medicaid beneficiary any amount exceeding the cost-sharing charges allowed under the state plan. The Secretary found it necessary to impose this limitation on provider recovery in order to effectuate Congress's intent and to ensure medical care for the needy. (See *Yanez v. Jones, supra,* 361 F.Supp. at p. 706.) As noted earlier, the Secretary has "broad authority" to effectuate Congress's intent in this context, and we must give its regulations " 'legislative effect.' " (*Schweiker, supra,* 453 U.S. at pp. 43-44 [101 S.Ct. at pp. 2639-2640].)

Our review of the language of these federal statutes and regulations limiting provider reimbursement in the context of the surrounding regulatory framework confirms this intent. Where, as here, probable liability of a third party cannot be established at the time the claim is filed, the state agency must pay the full amount due under its payment schedule. (See 42 C.F.R. § 433.139(c).) Under 42 Code of Federal Regulations part 447.15, the provider must "accept" this payment plus any cost-sharing charges allowed under the plan as "payment in full." Meanwhile, 42 United States Code

---

[15]The Secretary has amended 42 Code of Federal Regulations part 447.15 to permit the imposition of these cost-sharing charges.

section 1396a(a)(25)(C) and 42 Code of Federal Regulations part 447.20 (2002)—the corresponding regulation—prohibit providers from collecting from "an individual who is entitled to medical assistance under the state plan with respect to a service for which a third party is liable for payment" if "the amount of the liabilities of the third parties . . . is" equal to or greater than the amount payable under the state plan. (42 U.S.C. § 1396a(a)(25)(C); see also 42 C.F.R. § 447.20.) If the amount of the liabilities of the third party is less than the amount payable under the state plan, then the provider may collect from the individual *only* the lesser of "[a]ny cost-sharing payment amount" (42 C.F.R. § 447.20(a)(2)(i)) or "[a]n amount which represents the difference between the amount payable under the State plan . . . and the total of the established third party liability for the services" (42 C.F.R. § 447.20(a)(2)(ii); see also 42 U.S.C. § 1396a(a)(25)(C)).

Read together, these statutes and regulations are unambiguous and limit provider collections from a Medicaid beneficiary to, at most, the cost-sharing charges allowed under the state plan, even when a third party tortfeasor is later found liable for the injuries suffered by that beneficiary. (See *Mallo v. Public Health Trust of Dade County* (S.D.Fla. 2000) 88 F.Supp.2d 1376, 1385 (*Mallo*) [42 U.S.C. § 1396a(a)(25)(C) requires "the health care provider to collect from the Medicaid patient no more than the amount of the Medicaid payment"].) Thus, a health care provider may, at most, recover a "nominal" amount from the beneficiary. (42 U.S.C. § 1396o(a)(3) ["any deduction, cost sharing, or similar charge imposed under the plan . . . will be nominal in amount"].)

By contrast, under sections 14124.791 and 14124.74, a provider, after refunding the Medi-Cal payment, may recover the *full customary charge* for its services through a lien on the beneficiary's property—i.e., his or her recovery for lost wages or pain and suffering. Because this customary charge is usually, if not always, greater than the amount payable under Medicaid (see *McAmis v. Wallace, supra,* 980 F.Supp. at p. 182), these sections allow the provider to recover from the beneficiary an amount *greater* than the nominal cost-sharing charges allowed under the state plan. Because sections 14124.791 and 14124.74 allow the provider to recover more than these cost-sharing charges from the beneficiary, they cannot coexist with federal law and stand as an obstacle to the accomplishment of Congress's intent. (See *English, supra,* 496 U.S. at p. 79. [110 S.Ct. at p. 2275])

While federal statutes and regulations do not bar a provider from recovering from liable third parties, we reject defendant's contention that there is no collection from the beneficiary for purposes of federal law when a provider collects on a lien pursuant to sections 14124.791 and 14124.74. "A

lien is a charge imposed in some mode other than by a transfer in trust *upon specific property* by which it is made security for the performance of an act." (Civ. Code, § 2872, italics added.) In this case, a lien filed under section 14124.791 imposes a charge on the *entire* judgment, compromise, or settlement obtained by the Medicaid beneficiary, and the *entire* award otherwise accruing to the beneficiary may be used to satisfy the lien. Thus, a provider's recovery on the lien may encompass the portion of the judgment, compromise, or settlement compensating the beneficiary for, among other things, lost wages and pain and suffering—and not just the portion compensating her for medical expenses.[16] As such, sections 14124.791 and 14124.74 necessarily allow the provider to assert an interest in the *personal property of the Medicaid beneficiary.* (See *Martin ex rel. Hoff v. City of Rochester* (Minn. 2002) 642 N.W.2d 1, 15-16 (*Martin*) [claims "which accrue to the medical assistance recipient as a result of the injuries that necessitated the medical care . . . are the personal property of the medical assistance recipient"]; cf. Code Civ. Proc., § 695.030, subds. (a), (b)(2) [stating that "[a] cause of action for money or property that is the subject of a pending action or special proceeding" is the "property of the judgment debtor" and may be "subject to enforcement of a money judgment"].) And they do not give the provider the right to collect its fees directly from the third party tortfeasor. Recovery on a provider lien filed pursuant to section 14124.791 therefore comes from the beneficiary—and not from the third party tortfeasor—for purposes of federal law.

Even assuming federal law is ambiguous on this point, the June 9, 1997, policy clarification letter sent by the Acting Director of the Medicaid Bureau of the HCFA to all state Medicaid directors confirms that sections 14124.791 and 14124.74 conflict with federal law. ▪▪▪ Where a federal regulation is ambiguous, "an agency's interpretation of its own regulation is entitled to deference." (*Christensen v. Harris County* (2000) 529 U.S. 576, 588 [120 S.Ct. 1655, 1663, 146 L.Ed.2d 621] (*Christensen*).) ▪▪▪ As "the Secretary's attempt to give interpretive guidance to the states in advance of their submission of state Medicaid plans" (*Elizabeth Blackwell Center, supra,* 61 F.3d at p. 181, fn. omitted), this letter is a policy directive entitled to considerable deference (see *id.* at pp. 181-182 [according great deference to a policy directive issued by the Director of the Medicaid Bureau of the HCFA]).[17] In the letter, the acting director stated that "[f]ederal law would not preclude the practice of providers pursuing payment in tort situations in

---

[16]Section 14124.791, subdivision (c) does limit "[t]he provider's claim for reimbursement for fees . . . to the amount of the fees less 25 percent, which represents the provider's reasonable share of attorneys' fees for prosecution of the action and of the cost of litigation expense."

[17]In contrast, the letter in *Citizens Action League v. Kizer* (9th Cir. 1989) 887 F.2d 1003, 1007, simply represented the views of an administrator obtained solely for the purposes of the

excess of Medicaid reimbursement" as long as a state satisfies two conditions. First, the state must assure that Medicaid is made whole before the provider recovers any money. Second, the state must protect the assets of Medicaid beneficiaries by limiting provider recovery to the portion of the award specifically allocated for the beneficiary's medical expenses.

Although sections 14124.791 and 14124.74 meet the first condition, they do not meet the second. Under these statutes, the *entire* award obtained by the Medicaid beneficiary is subject to a lien filed under section 14124.791; the statutes do not limit provider recovery to the portion of the award specifically allocated to medical expenses. As the policy clarification observed, portions of the award unrelated to medical expenses constitute the "general assets of the" beneficiary for purposes of federal law. Even if the beneficiary may request an allocation of the award, as suggested by defendant, nothing in the statutes ensures that the provider's recovery will be limited to the portion of the award allocated to medical expenses.[18] Thus, the provider lien statutes do not satisfy the second condition required by the policy clarification. Because the letter clearly states that any scheme permitting provider recovery in excess of Medicaid reimbursement without satisfying this condition violates federal law, sections 14124.791 and 14124.74 are preempted.[19]

Cases holding that a lien asserted by a state Medicaid agency against the entire judgment, compromise or settlement of a Medicaid beneficiary "does not violate the statutory prohibition against imposing a lien against a beneficiary's property" are inapposite. (*Cricchio v. Pennisi* (1997) 90 N.Y.2d

---

litigation. (See *Irving v. U.S.* (1st Cir. 1998) 162 F.3d 154, 166 [noting that the statements of an official policymaker are entitled to greater deference than statements from administrators].)

[18]Contrary to defendant's assertion, the limitation on provider recovery found in section 14019.3, subdivision (d) does not apply here. This section limits provider recovery to the "fees . . . that any other contractual entitlement . . . is obligated to pay the charges for the care provided the beneficiary." (§ 14019.3, subd. (d), italics added.) Because a third party tortfeasor is not a "contractual entitlement," section 14019.3, subdivision (d) is inapplicable.

[19]*Mercy Hospital & Medical Center v. Farmers Ins. Group of Companies* (1997) 15 Cal.4th 213 [61 Cal.Rptr.2d 638, 932 P.2d 210] does not dictate a contrary result. In *Mercy Hospital*, we addressed Civil Code sections 3045.1 through 3045.6—which give hospitals a statutory lien "against any judgment, compromise, or settlement received by the patient from a third person responsible for his or her injuries." (*Mercy Hospital*, at p. 215.) In dicta, we stated that this lien was "California's first statutory medical lien in favor of a hospital against third persons liable for the patient's injuries." (*Id.* at p. 217.) Even assuming our statement was accurate, we did not mean that recovery on liens filed under section 14124.791 are collections from a third party rather than the Medicaid beneficiary for purposes of federal law. Indeed, *Mercy Hospital* did not involve federal law. Thus, it is inapplicable here. Accordingly, we need not resolve any purported conflict between *Nishihama v. City & Co. of San Francisco* (2001) 93 Cal.App.4th 298 [112 Cal.Rptr.2d 861] and *Swanson v. St. John's Regional Medical Center* (2002) 97 Cal.App.4th 245 [118 Cal.Rptr.2d 325].

296 [660 N.Y.S.2d 679, 683 N.E.2d 301, 305].)[20] These cases hold that the agency's lien does not attach to the property of the beneficiary because the beneficiary, by statute, has to assign to the agency "any rights he or she has to seek reimbursement from any third party up to the amount of medical assistance paid." (*Cricchio*, at p. 304.) "Because the injured Medicaid [beneficiary] has assigned its recovery rights to [the state agency], and [the agency] is subrogated to the rights of the beneficiary [citations], the settlement proceeds are resources of the third-party tortfeasor that are owed to [the agency]." (*Id.* at p. 305.) The state agency therefore "steps in and puts a lien on the recovery *before it becomes the property of the Medicaid [beneficiary].*" (*Wilson v. Washington, supra,* 10 P.3d at p. 1066, italics added.)

Medicaid beneficiaries do not, however, have to assign to providers their right to recover from third parties. Thus, a provider does not have a direct cause of action against a third party tortfeasor and may not independently recover any amount from that tortfeasor. Consequently, a lien filed under section 14124.791 does not attach until *after* the judgment, compromise, or settlement becomes the property of the Medicaid beneficiary. Recovery of any amount not allocated to medical expenses therefore constitutes a collection from the beneficiary's personal property. Because the lien allows the provider to recover from the beneficiary an amount *exceeding* the nominal cost-sharing charges allowed by federal Medicaid law, the lien cannot coexist with federal law and stands as an obstacle to the accomplishment of the objectives of Medicaid.

While no California courts have addressed the preemption question (but see *Palumbo v. Myers* (1983) 149 Cal.App.3d 1020, 1031, fn. 10 [197 Cal.Rptr. 214] [acknowledging the "lurking preemption question"]), our finding of preemption comports with decisions reached by other jurisdictions. In *Public Health Trust of Dade Co. v. Dade Co. School Bd.* (Fla.Dist.Ct.App. 1997) 693 So.2d 562, 567, a Florida court of appeal found that federal law preempted a state regulation analogous to section 14124.791. Under this regulation, a provider could recover "third-party benefits on behalf of Medicaid and after Medicaid has been made whole, 'any excess third-party benefits collected by a provider are permitted to be

[20](See also *Calvanese v. Calvanese* (1999) 93 N.Y.2d 111 [688 N.Y.S.2d 479, 710 N.E.2d 1079, 1081] [following *Cricchio v. Pennisi, supra,* 683 N.E.2d 301]; *S.S. v. State* (Utah 1998) 972 P.2d 439, 442 ["Payments made by a third party do not legally become the property of the recipient until after a valid settlement, which necessarily must include reimbursement to Medicaid"]; *Wilson v. Washington* (2000) 142 Wash.2d 40 [10 P.3d 1061, 1066] ["Because the [State Medicaid agency] does not have a lien on 'property' of the recipient, the state statute permitting this lien is not in conflict with the federal statute"]; but see *Martin, supra,* 642 N.W.2d at p. 16 [finding that a lien asserted by the state Medicaid agency constitutes a lien against "the personal property of the" Medicaid beneficiary in violation of federal law].)

applied to provider charges that exceed Medicaid payment . . . .' " (*Public Health Trust*, at p. 564, quoting Fla. Admin. Code Ann. r. 59G-7.055, subd. (6).) Invalidating the regulation, the court concluded that it was "in direct conflict with federal [M]edicaid laws . . . which provide that when a medical provider accepts payment from Medicaid, such payment constitutes 'payment in full.' " (*Public Health Trust*, at p. 566.)

Using similar reasoning, the Seventh Circuit Court of Appeals barred a provider from suing a Medicaid beneficiary for the full cost of its services even though the provider was willing to refund the Medicaid payment. (*Evanston Hospital v. Hauck* (7th Cir. 1993) 1 F.3d 540, 544 (*Hauck*).) In *Hauck*, a provider was paid by the state Medicaid agency. After the patient obtained a multimillion-dollar judgment, the provider sued the Medicaid beneficiary and the state agency, seeking a declaration that the provider could refund the Medicaid payment and sue the beneficiary for the full cost of its services. Citing various state and federal statutes, including 42 United States Code section 1396a(a)(25), the Seventh Circuit Court of Appeals concluded that the provider could not recover from the beneficiary once it received payment from Medicaid. (*Hauck*, at pp. 543-544.) Although *Hauck* did not involve a state statute that expressly authorized provider recovery from a beneficiary, its conclusion is equally applicable here.

A Florida federal district court also used this reasoning to hold that a Medicaid beneficiary may sue a provider under title 42 United States Code section 1983. (See *Mallo*, *supra*, 88 F.Supp.2d at p. 1391.) In *Mallo*, a provider sought to recover more than the Medicaid payment by asserting a lien for the full costs of its services against any recovery obtained by a Medicaid beneficiary. The court found that the patient could sue the provider for asserting this lien because "the structure of [section] 1396a(a)(25)(C) creates a third-party beneficiary contractual obligation on the part of the health care provider to collect from the Medicaid patient *no more than* the amount of the Medicaid payment." (*Id.* at p. 1385, italics added.) "Once a health care provider commits to Medicaid assistance for a patient, the provider is barred from billing the patient for an amount in excess of the State's Medicaid disbursement." (*Id.* at p. 1387.)

These cases establish that a provider that treats a Medicaid beneficiary may not recover from that beneficiary an amount exceeding the Medicaid payment by asserting a lien against the beneficiary's entire recovery from a third party tortfeasor. Defendant does not cite, and we could not find, any case law to the contrary. In fact, virtually every case addressing the federal Medicaid statutes and regulations governing provider reimbursement holds that "[u]nder federal law, medical service providers must accept the state-approved Medicaid payment as payment-in-full, and may not require that

patients pay anything beyond that amount." (*Barney v. Holzer Clinic, Ltd.* (6th Cir. 1997) 110 F.3d 1207, 1210.)[21] By finding that federal law preempts sections 14124.791 and 14124.74 and, in doing so, renders defendant's lien invalid, we merely join this chorus.

Defendant's contention that federal law prohibits only balance billing— and not the substitute billing authorized by sections 14124.791 and 14124.74—is not persuasive. We acknowledge that liens filed pursuant to section 14124.791 are not strictly a form of balance billing because the lien holder must refund the Medi-Cal payment before recovering on them. But nothing in the language or history of the federal statutes and regulations restricting provider recovery from Medicaid beneficiaries limits their restrictions to balance billing. The mere fact that "[t]hese restrictions are commonly known as the prohibition against 'balance billing' " does not mean that these restrictions only prohibit balance billing. (*Palumbo v. Myers*, *supra*, 149 Cal.App.3d at p. 1025.)

The Secretary's approval of California's Medicaid plan does not dictate a contrary conclusion. Even assuming this approval "is entitled to great weight and deference" (*RCJ Medical Services, Inc. v. Bonta´* (2001) 91 Cal.App.4th 986, 1010 [111 Cal.Rptr.2d 223]; see also *Garfield Medical Center v. Belshé* (1998) 68 Cal.App.4th 798, 808 [80 Cal.Rptr.2d 527]), nothing in the record indicates that the Secretary approved California's provider lien provisions or that California even submitted these provisions to the Secretary for approval. Thus, the Secretary's approval of California's plan does not mean the Secretary approved sections 14124.791 and 14124.74. (See *In re Washington State Dept. of Social and Health Servs.* (U.S.H.H.S.App.Div. 1996) 1996 WL 157123 [absent evidence the state submitted the specific provisions at issue to the Secretary, approval of the state plan does not equate to agency ratification of those provisions].) Indeed, the 1997 policy clarification strongly suggests that the Secretary would not approve these lien statutes. (See *ante*, at pp. 821-822.) ██ In any event, the Secretary's actions are only entitled to deference if they are not arbitrary, capricious, an abuse of

---

[21](See, e.g., *Rehabilitation Ass'n of Va. v. Kozlowski, supra*, 42 F.3d at p. 1447 ["Service providers who participate in the Medicaid program are required to accept payment of the state-denoted Medicaid fee as payment in full for their services, i.e., they are required to take assignment, and may not attempt to recover any additional amounts elsewhere"]; *Snider, supra*, 29 F.3d at p. 889 ["Medicaid service providers . . . must accept the Medicaid payment as payment in full, and may not ask the Medicaid patient to pay any money beyond that amount"]; *Banks v. Secretary of Indiana Family & Soc. Serv., supra*, 997 F.2d at p. 243 ["a Medicaid provider is prohibited from seeking payment from a Medicaid recipient of amounts not reimbursed by the state program"]; *New York City Health and Hospitals v. Perales* (2d Cir. 1992) 954 F.2d 854, 856 ["Those doctors and hospitals who are willing to treat Medicaid patients must agree to accept the designated Medicaid rate and not ask the patient to pay any money beyond that amount"].)

discretion, or in conflict with governing law. (See *RCJ Medical*, at p. 1011.) And the Secretary's "interpretation of its own regulations" is only controlling if it is neither " ' "plainly erroneous [n]or inconsistent with the regulation." ' " (*Thomas Jefferson Univ. v. Shalala* (1994) 512 U.S. 504, 512 [114 S.Ct. 2381, 2386, 129 L.Ed.2d 405].) ▮▮ Because sections 14124.791 and 14124.74 conflict with the plain language of governing federal statutes and regulations (see *ante*, at pp. 820-822), the Secretary's approval does not control here.

We also do not find the April 19, 1995, HCFA letter persuasive. In the letter, Sharon Yee, Chief of the Program Operations Branch, Division of Medicaid, HCFA, answered several questions posed by an attorney. Her letter opined that "[n]o federal waiver [was] required for the implementation of [Welfare and Institutions Code sections] 14124.791 and 14019.3" and that these sections do not conflict with 42 Code of Federal Regulations part 447.15. Her conclusions, however, are not persuasive because Yee did not consider all the relevant federal statutes and regulations, including 42 United States Code section 1396a(a)(25)(C) and part 447.20 of 42 Code of Federal Regulations. (See *Christensen, supra*, 529 U.S. at p. 587 [120 S.Ct. at p. 1663] ["[I]nterpretations contained in formats such as opinion letters are 'entitled to respect' . . . , but only to the extent that those interpretations have the 'power to persuade' "].) Moreover, Yee's letter predates and conflicts with the 1997 policy clarification issued by the acting director of the HCFA. Because an agency's institutional pronouncements command greater respect than the pronouncements of an administrator, we decline to accord any deference to Yee's letter. (See *Irving v. U.S., supra*, 162 F.3d at p. 166.) In any event, federal law is not ambiguous and unequivocally prohibits California from authorizing provider recovery on liens against the entire judgment or settlement obtained by a Medicaid beneficiary from a third party tortfeasor. (See *ante*, at pp. 820-822.) We therefore conclude that federal law preempts sections 14124.791 and 14124.74. (See *Christensen, supra*, 529 U.S. at p. 588 [120 S.Ct. at p. 1663] [holding that deference to an agency's interpretation of its regulations is only appropriate where the regulation is ambiguous].) These provider lien statutes are therefore unconstitutional, and the California statute limiting provider recovery from Medicaid beneficiaries in accordance with federal Medicaid law controls. This statute prohibits providers from attempting to obtain payment for their services directly from Medicaid beneficiaries. (See § 14019.4, subd. (a).) Because defendant's lien against plaintiff constitutes such an attempt, it is invalid, unenforceable, and uncollectible.

But we do so reluctantly. By invalidating liens filed pursuant to section 14124.791, we give the third party tortfeasor a windfall at the expense of the

innocent health care provider. Because the provider may no longer assert a lien for the full cost of its services, the Medicaid beneficiary may only recover the amount payable under Medicaid as his or her medical expenses in an action against a third party tortfeasor. (See *Hanif v. Housing Authority* (1988) 200 Cal.App.3d 635, 639-644 [246 Cal.Rptr. 192] [where the provider has relinquished any claim to additional reimbursement, a Medicaid beneficiary may only recover the amount payable under the state Medicaid plan as medical expenses in a tort action].) As a result, the tortfeasor escapes liability for the full amount of the medical expenses he or she wrongfully caused. Such a result not only benefits the party who should be responsible for the medical costs of the beneficiary at the expense of the blameless provider, it also harms society as a whole. Because health care providers cannot recover the full costs of their services from responsible tortfeasors, they must either charge more to those innocent patients who can pay in order to recoup their losses or stop providing medical care to the needy. In the end, everybody suffers but the third party tortfeasor. We therefore urge the Legislature to remedy this anomaly in a manner consistent with federal law.

## III

Despite finding that federal law preempts the lien provisions, we must still determine whether the trial court properly sustained defendant's demurrer and dismissed plaintiff's entire action on other grounds. We conclude it did.

## A

We begin with plaintiff's unfair competition claim. In affirming the dismissal of this claim, the Court of Appeal held that plaintiff's "UCL claim is . . . barred by *Cel-Tech*'s safe harbor protection." Plaintiff contends there is no safe harbor for defendant's practice of filing liens under section 14124.791 if the lien provisions are preempted by federal law. We disagree.

As relevant here, "[t]he UCL defines unfair competition as any unlawful, unfair or fraudulent business practice . . . ." (*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494, 1505 [82 Cal.Rptr.2d 368]; see also Bus. & Prof. Code, § 17200.) A business practice is unlawful "if it is forbidden by any law . . . ." (*People v. Duz-Mor Diagnostic Laboratory, Inc.* (1998) 68 Cal.App.4th 654, 658 [80 Cal.Rptr.2d 419].) A business practice, however, may be unfair or fraudulent in violation of the UCL even if the practice does not violate any law. (See *Cel-Tech, supra,* 20 Cal.4th at p. 180.)

In *Cel-Tech,* we considered a UCL claim for unfair—but not unlawful—business practices and recognized a safe harbor from such claims for acts

expressly allowed by the Legislature. "If the Legislature has permitted certain conduct or considered a situation and concluded no action should lie, courts may not override that determination. When specific legislation provides a 'safe harbor,' plaintiffs may not use the general unfair competition law to assault that harbor." (*Cel-Tech, supra,* 20 Cal.4th at p. 182.) Thus, "[a]cts that the Legislature has determined to be lawful may not form the basis for an action under the unfair competition law . . . ." (*Id.* at p. 183.) Nonetheless, "the Legislature's mere failure to prohibit an activity does not prevent a court from finding it unfair." (*Id.* at p. 184.)

Although plaintiff concedes sections 14124.791 and 14124.74 expressly permitted the liens filed by defendant, she contends these statutes do not provide a safe harbor for defendant's conduct because they conflict with federal law. This contention is meritless.

We initially reject plaintiff's contention that these statutes do not insulate defendant's conduct from a UCL claim because defendant violated federal Medicaid law by filing the liens. According to plaintiff, the *Cel-Tech* safe harbor cannot protect defendant from UCL claims for *unlawful* business practices. We, however, need not determine whether the safe harbor applies to unlawful business practices, because plaintiff cannot establish that defendant violated federal law.[22] "Private providers of services . . . derive their obligations from state law and through their contractual agreements with the states, *not from title XIX*." (*Stewart v. Bernstein* (5th Cir. 1985) 769 F.2d 1088, 1094, italics added.) Federal Medicaid statutes and regulations do not impose "any obligation upon Medicaid providers." (*Yanez v. Jones, supra,* 361 F.Supp. at p. 707; see also *Harding v. Summit Medical Center* (9th Cir. 2002) 41 Fed.Appx. 83, 84 ["[U.S.C.] § 1396a(a)(25)(C) . . . is formulated as a requirement of a state plan; it imposes no independent obligation on medical providers"].) Rather, they create "a duty which runs to the State alone." (*Yanez,* at p. 707.) " 'It is clear from the legislative history that . . . the [Medicaid] legislation is primarily directed at the role of participating *states* in providing medical care with the assistance of federal funds.' " (*Solter v. Health Partners of Philadelphia* (E.D.Pa. 2002) 215 F.Supp.2d 533, 540.) Because federal Medicaid law governs states—and not providers— defendants did not and could not violate federal law by filing liens under section 14124.791.

None of the cases cited by plaintiff hold to the contrary. In *Hauck,* the Seventh Circuit Court of Appeals declared that the provider would violate Illinois statutes—which were consistent with the requirements imposed by

---

[22]Plaintiff does not contend defendant's filing of liens pursuant to sections 14124.791 and 14124.74 violated any California laws.

federal Medicaid law—if it sought recovery from a Medicaid beneficiary after refunding the Medicaid payment. (See *Hauck, supra,* 1 F.3d at pp. 542-543.) It did not hold that the provider would violate federal law. Likewise, *Samuel v. California Dept. of Health Services* (N.D.Cal. 1983) 570 F.Supp. 566, 573, merely found that the state Medicaid agency misconstrued its own regulation and enjoined the agency from advising health care providers to follow its erroneous construction. It found no violation of federal law by a provider. (*Id.* at p. 574.) Finally, the Court of Appeal in *Brillantes v. Superior Court* (1996) 51 Cal.App.4th 323, 336-339 [58 Cal.Rptr.2d 770], only examined a provider's obligations under certain California Medi-Cal statutes and did not consider or discuss federal Medicaid law.

We also reject plaintiff's contention that sections 14124.791 and 14124.74 do not provide a safe harbor from her UCL claim because our finding of preemption should apply retroactively. By enacting these statutes, the Legislature declared that provider liens were lawful so long as the statutes remained in effect. (See *Cel-Tech, supra,* 20 Cal.4th at pp. 183-184.) Moreover, "retroactive application of a decision disapproving prior authority on which a person may reasonably rely in determining what conduct will subject the person to penalties, denies due process." (*Moss v. Superior Court* (1998) 17 Cal.4th 396, 429 [71 Cal.Rptr.2d 215, 950 P.2d 59].) Validly enacted statutes such as sections 14124.791 and 14124.74 undoubtedly constitute such authority. Just as courts must presume "that the Legislature intended . . . not to violate the Constitution, but to enact a valid statute within the scope of its constitutional powers" (*Miller v. Municipal Court* (1943) 22 Cal.2d 818, 828 [142 P.2d 297]), Californians should be able to presume that statutes enacted by the Legislature are constitutional. Otherwise, we place our citizens in the untenable position of guessing whether their conduct may subject them to penalty even when the Legislature has expressly condoned it. (Cf. *Michigan v. DeFillippo* (1979) 443 U.S. 31, 37-38 [99 S.Ct. 2627, 2632, 61 L.Ed.2d 343] ["A prudent officer . . . should not have been required to anticipate that a court would later hold the ordinance unconstitutional"].) We therefore conclude that sections 14124.791 and 14124.74 create a safe harbor protecting defendant from plaintiff's claim of unfair business practices.

Using similar reasoning, we find that plaintiff cannot state an unfair competition claim premised on defendant's alleged breach of its Medi-Cal provider agreement. Assuming that the provider agreements in the record accurately reflect defendant's current agreement, they establish that "Part 3, Division 9 of the Welfare and Institutions Code"—which includes sections

14124.791 and 14124.74—governs and supersedes any conflicting provisions in the agreement.[23] Sections 14124.791 and 14124.74 therefore provide defendant with a safe harbor from unfair competition claims premised on any breach of its provider agreement. Accordingly, we find that the trial court properly sustained the demurrer to plaintiff's unfair competition claim without leave to amend.

## B

 We now turn to plaintiff's tort claims. In affirming the dismissal of these claims, the Court of Appeal held that the litigation privilege shielded defendant from plaintiff's tort claims. We agree.

 The litigation privilege, as codified in Civil Code section 47, subdivision (b), shields, among other things, any "publication or broadcast" made "[i]n any . . . judicial proceeding." The privilege is "absolute in nature" (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 215 [266 Cal.Rptr. 638, 786 P.2d 365]), and its "principal purpose . . . is to afford litigants and witnesses . . . the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions" (*id.* at p. 213). "Although the litigation privilege was originally limited to shielding litigants, attorneys and witnesses from liability for defamation [citations], it has been interpreted to apply to virtually all torts except malicious prosecution." (*Kimmel v. Goland* (1990) 51 Cal.3d 202, 209 [271 Cal.Rptr. 191, 793 P.2d 524].)

"The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson, supra,* 50 Cal.3d at p. 212.) As a general rule, the privilege " 'applies only to communicative acts and does not privilege tortious courses of conduct.' " (*LiMandri v. Judkins* (1997) 52 Cal.App.4th 326, 345 [60 Cal.Rptr.2d 539], quoting *Kupiec v. American Internat. Adjustment Co.* (1991) 235 Cal.App.3d 1326, 1331 [1 Cal.Rptr.2d 371].) We have, however, extended the privilege to "any publication . . . that is required [citation] or permitted [citation] by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is invoked." (*Albertson*

---

[23]The two provider agreements submitted by plaintiff predate the 1992 enactment of section 14124.791.

*v. Raboff* (1956) 46 Cal.2d 375, 380-381 [295 P.2d 405].) Thus, our courts have extended the protections of the litigation privilege to "the recordation of a notice of *lis pendens*" (*id.* at p. 381), "the publication of an assessment lien" (*Wilton v. Mountain Wood Homeowners Assn., Inc.* (1993) 18 Cal.App.4th 565, 570 [22 Cal.Rptr.2d 471] (*Wilton*)), and "the filing of a claim of mechanic's lien in conjunction with a judicial proceeding to enforce it" (*Frank Pisano & Associates v. Taggart* (1972) 29 Cal.App.3d 1, 25 [105 Cal.Rptr. 414] (*Pisano*)).

■ Plaintiff concedes sections 14124.791 and 14124.74 permitted the liens filed by defendant. Plaintiff does not dispute that defendant filed the liens to achieve the objects of the litigation or that the liens are connected to litigation filed by plaintiff and other class members. Thus, the litigation privilege shields defendant's assertion of liens pursuant to sections 14124.791 and 14124.74 from plaintiff's claims.[24] (See *Albertson v. Raboff, supra,* 46 Cal.2d at pp. 380-381; *Wilton, supra,* 18 Cal.App.4th at p. 570; *Pisano, supra,* 29 Cal.App.3d at p. 25.)

In reaching this conclusion, we reject plaintiff's contention that defendant's practice of using these statutorily authorized liens "to seize funds" in violation of federal law is noncommunicative conduct falling outside the litigation privilege. The only tortious acts alleged by plaintiff were defendant's assertion of liens pursuant to section 14124.791. Plaintiff did not allege that defendant committed any acts not authorized by sections 14124.791 and 14124.74. Thus, *LiMandri* is inapposite. (See *LiMandri v. Judkins, supra,* 52 Cal.App.4th at p. 345 [finding that the litigation privilege did not shield the defendant's conduct because "the isolated act of filing [the defendant's] notice of lien . . . was only one act in the overall course of conduct alleged in" the complaint].) Indeed, the gravamen of plaintiff's complaint is a communication—the assertion of liens pursuant to sections 14124.791 and 14124.74—protected by the litigation privilege. (See *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1132, fn. 12 [270 Cal.Rptr. 1, 791 P.2d 587].)

We also find that defendant filed the liens as a "participant authorized by law" notwithstanding plaintiff's assertions to the contrary. (See *Silberg v. Anderson, supra,* 50 Cal.3d at p. 212.) Although we hold that federal law preempts sections 14124.791 and 14124.74 and invalidates defendant's liens, defendant undoubtedly had a legal right to assert the liens prior to our

---

[24]Plaintiff did not assert a malicious prosecution claim. (See *Kimmel v. Goland, supra,* 51 Cal.3d at p. 209.)

holding here. As explained earlier, we refuse to penalize defendant for following validly enacted statutes. (See *ante*, at pp. 829-830.)

Finally, we believe plaintiff distorts the impact of our application of the litigation privilege in this case. Our holding is quite limited. We merely hold that the assertion of liens as authorized by validly enacted California statutes is shielded by the litigation privilege. This limited holding does not "pervert[] the judicial process and place[] the court in the unfortunate position of shielding, rather than addressing, wrongful conduct." The cases cited by plaintiff are inapposite. Neither *Barquis v. Merchants Collection Assn.* (1972) 7 Cal.3d 94 [101 Cal.Rptr. 745, 496 P.2d 817] nor *Yu v. Signet Bank/Virginia* (1999) 69 Cal.App.4th 1377 [82 Cal.Rptr.2d 304] involved liens filed pursuant to validly enacted statutes or addressed the scope of the litigation privilege. Accordingly, we find that the litigation privilege bars plaintiff's claims.

## DISPOSITION

We reverse the portion of the judgment of the Court of Appeal adding a declaration that federal law preempts section 14124.791, but affirm the judgment in all other respects.

George, C. J., Kennard, J., Baxter, J., Chin, J., and Moreno, J., concurred.

**GEORGE, C. J.,** Concurring.—I have signed the majority opinion, but I have done so on the understanding that the opinion does not create the overbroad "safe harbor" to which Justice Werdegar's concurring opinion properly objects. I agree with Justice Werdegar that a business whose ongoing practices are found unlawful or unfair could not complain, on fairness grounds, "of being *enjoined* from further such violations" in the future, even if the business's *past* conduct was based on what seemed to be an enforceable state law. (Conc. opn. of Werdegar, J., *post*, at p. 833.) And I also agree that a grant of monetary relief "is not necessarily unfair merely because the defendant business believed in good faith that its practice was lawful." (*Ibid.*) In my view, the majority opinion need not, and should not, be read as inconsistent with these propositions.

**WERDEGAR, J.,** Concurring.—I agree with the majority that California statutes purporting to authorize care providers' liens against Medi-Cal patients' monetary recoveries from third parties (Welf. & Inst. Code,

§§ 14124.74, 14124.791) are unenforceable because they conflict with federal law, and that plaintiff's tort claims for relief based on defendant's having filed and asserted such liens are barred by the litigation privilege of Civil Code section 47, subdivision (b). Under our precedents, moreover, that privilege appears applicable to plaintiff's cause of action under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.), as well as to her causes of action for fraud, negligent misrepresentation, and trespass to chattels. (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1200-1204 [17 Cal.Rptr.2d 828, 847 P.2d 1044]; *Ribas v. Clark* (1985) 38 Cal.3d 355, 364-365 [212 Cal.Rptr. 143, 696 P.2d 637, 49 A.L.R.4th 417].)

I do not agree, however, with the majority's creation of a broad due process "safe harbor" for actions taken in reliance on preempted—and therefore invalid—state laws. (Maj. opn., *ante*, at pp. 829-830.) In *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 182-183 [83 Cal.Rptr.2d 548, 973 P.2d 527], this court held a business practice made lawful by statute could not be judged "unfair" for purposes of the unfair competition law. The shelter thus recognized was *statutory* and drew protection from valid, enforceable California law. The majority's safe harbor, in contrast, is apparently founded on concepts of constitutional due process and draws protection from state laws that, because they conflict with superior federal law, are completely unenforceable.

Were this an action seeking to *punish* defendant for conduct approved by facially valid state law, I might well agree that fundamental fairness, and hence the constitutional guarantees of due process, would bar the action. (See *Moss v. Superior Court* (1998) 17 Cal.4th 396, 429 [71 Cal.Rptr.2d 215, 950 P.2d 59] [relating to penalties].) But Business and Professions Code section 17203, which sets out the available remedies in a private action under the unfair competition law, provides for neither criminal nor civil penalties and allows no award of damages at all, much less punitive damages. (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 173 [96 Cal.Rptr.2d 518, 999 P.2d 706].) A business whose practices are found unlawful or unfair could hardly complain, on fairness grounds, of being *enjoined* from further such violations, even if the practices were based on what seemed an enforceable state law. Even a grant of the monetary relief available under Business and Professions Code section 17203 ("restor[ation] to any person in interest any money or property . . . acquired by means of such unfair competition") is not necessarily unfair merely because the defendant business believed in good faith that its practice was lawful. "Rather, in general, as between a person who is enriched as the result of his or her violation of the law, and a person intended to be protected by the law

who is harmed by its violation, for the violator to retain the benefit would be unjust." (*Cortez v. Purolator Air Filtration Products Co.*, *supra*, at p. 182 (conc. opn. of Werdegar, J.).)

For these reasons, I concur in the result, but not all the reasoning, of the majority opinion.